

# U.S. ELECTION ASSISTANCE COMMISSION
## OFFICE OF INSPECTOR GENERAL

### FINAL REPORT:

### ADMINISTRATION OF PAYMENTS RECEIVED UNDER THE HELP AMERICA VOTE ACT BY THE COLORADO SECRETARY OF STATE

**APRIL 28, 2013 THROUGH SEPTEMBER 30, 2012**

**Report No.
E-HP-CO-05-12
January 2014**

Exhibit 5



**U.S. ELECTION ASSISTANCE COMMISSION**
OFFICE OF INSPECTOR GENERAL
1335 East West Highway - Suite 4300
Silver Spring, MD 20910

Memorandum

January 28, 2014

To:        Alice Miller
           Acting Executive Director

From:      Curtis W. Crider
           Inspector General

Subject:   Final Performance Audit Report – Administration of Payments Received
           Under the Help America Vote Act by the Colorado Secretary of State
           (Assignment Number E-HP-CO-05-12)

We contracted with the independent certified public accounting firm of McBride, Lock & Associates to audit the administration of payments received under the Help America Vote Act (HAVA) by the Colorado Secretary of State (SOS).

In its audit, McBride, Lock & Associates concluded that the Colorado Secretary of State (SOS) generally accounted for and expended the HAVA funds in accordance with applicable requirements for the period from April 28, 2003 through September 30, 2012. However the following exceptions were identified;

- The Office lacks sufficiently comprehensive written guidelines for the preparation, documentation and timely submission of Federal reports, and related policies for their review and approval, which resulted in one report that could not be entirely supported by or agreed to the accounting records.

- The Office's equipment management is not in compliance with 41 CFR 105-71.132 with respect to property records and the performance of biennial physical inventories.

- The Office expended HAVA funds for purposes that are not allowable under the award's terms and conditions or HAVA regulations, utilizing processes that were not consistent with the Federal and State laws and regulations

In  responses to the draft report (Attachment A-1 from the Colorado Secretary of State and A-2 from the Colorado Attorney General), the State agreed with the  finding related to federal reports but did not agree with the findings related to equipment management or the finding related to the improper use of HAVA funds or the resulting $362,691 in questioned costs.

In the report McBride, Lock & Associates summarized the SOS's response to the recommendations, as well as their comments on the responses after the recommendations. Also included in the report is the EAC response to the draft report (Appendix A-3) which indicated that the EAC would work with the SOS to ensure corrective action.

Exhibit 5

We would appreciate being kept informed of the actions taken on our recommendations as we will track the status of their implementation. Please respond in writing to the finding and recommendation included in this report by March 28, 2014. Your response should include information on actions taken or planned, targeted completion dates, and titles of officials responsible for implementation.

To fulfill our responsibilities under Government Auditing Standards, the Office of Inspector General:

- Reviewed McBride, Lock & Associates' approach and planning of the audit;

- Evaluated the qualifications and independence of the auditors;

- Monitored the progress of the audit at key points;

- Reviewed the audit report, prepared by McBride, Lock & Associates to ensure compliance with Government Auditing Standards; and

- Coordinated issuance of the audit report.

McBride, Lock & Associates is responsible for the attached auditor's report and the conclusions expressed in the report. We do not express any opinion on the conclusions presented in McBride, Lock & Associates audit report.

The legislation creating the Office of Inspector General requires that we report to Congress semiannually on all audit reports issued, actions taken to implement our recommendations, and recommendations that have not been implemented.

If you have any questions regarding this report, please call me at (301) 734-3104.


Attachment


cc: Director of Grants and Payments

Exhibit 5

**Performance Audit Report**

**Administration of Payments Received Under the Help America Vote Act by the Colorado Secretary of State**

Prepared for

**The United States Election Assistance Commission (EAC)
Office of Inspector General**

By

**McBride, Lock & Associates**

July 2013

MᴄBRIDE, LOCK & ASSOCIATES

CERTIFIED PUBLIC ACCOUNTANTS
KANSAS CITY

Exhibit 5

**Performance Audit Report**
**Administration of Payments Received Under the Help America Vote Act by the Colorado Secretary of State**

TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY                                    1

BACKGROUND                                          2

AUDIT OBJECTIVES                                    4

SCOPE AND METHODOLOGY                               5

AUDIT RESULTS                                       5

APPENDICES:

 Appendix A-1: Response of the Colorado Secretary of State to the Draft Report

 Appendix A-2: Letter from the Colorado Attorney General

 Appendix A-3: Response of the U.S. Election Assistance Commission to the Draft Report

 Appendix B: Audit Methodology

 Appendix C: Monetary Impact as of September 30, 2012

Exhibit 5

# U.S. Election Assistance Commission
# Performance Audit Report
# Administration of Payments Received Under the Help America Vote Act by the Colorado Secretary of State

## EXECUTIVE SUMMARY

McBride, Lock & Associates was engaged by the United States Election Assistance Commission (EAC) Office of the Inspector General to conduct a performance audit of the Office of the Colorado Secretary of State (Office) from inception on April 28, 2003 through September 30, 2012 to determine whether the Office used payments authorized by Sections 101, 102, and 251 of the Help America Vote Act of 2002 (HAVA) in accordance with HAVA and applicable requirements; accurately and properly accounted for property purchased with HAVA payments and for program income; maintained state expenditures at a level not less than the level maintained in the fiscal year ending prior to November 2000; and met HAVA requirements for Section 251 funds for an election fund and for a matching contribution.

In addition, the Commission requires states to comply with certain financial management requirements, specifically:

- Comply with the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local Government,* 41 CFR 105-71, (originally Office of Management and Budget Circular A-102, also known as the "Common Rule").

- Expend payments in accordance with cost principles set forth in *Cost Principles for State and Local Governments*, 2 CFR 225, (originally Office of Management and Budget Circular A-87) for establishing the allowability or unallowability of certain items of cost for federal participation.

- Follow the requirements of the Federal Cash Management and Improvement Act.

- Submit detailed annual financial reports on the use of Title I and Title II payments.

- Comply with the provisions of *Audits of States, Local Governments and Non-Profit Organizations* (Office of Management and Budget Circular A-133).

We conducted this performance audit in accordance with *Generally Accepted Government Auditing Standards*. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on the audit objectives.

Exhibit 5

Based on the audit procedures performed, except for the matters discussed below, we concluded that the Office generally accounted for and expended the Grant funds in accordance with the requirements mentioned above for the period from April 28, 2003 through September 30, 2012. The exceptions are as follows:

1. The Office lacks sufficiently comprehensive written guidelines for the preparation, documentation and timely submission of Federal reports, and related policies for their review and approval, which resulting in one report that could not be entirely supported by or agreed to the accounting records.

2. The Office's equipment management is not in compliance with 41 CFR 105-71.132 with respect to property records and the performance of biennial physical inventories.

3. The Office expended HAVA funds for purposes that are not allowable under the award's terms and conditions or HAVA regulations, utilizing processes that are not consistent with the Federal and State laws and regulations.

We have included in this report as Appendix A, the Secretary of State's written response to the draft report. Such response has not been subjected to the audit procedures and, accordingly, we do not provide any form of assurance on the appropriateness of the response or the effectiveness of the corrective actions described therein.


## BACKGROUND

The Help America Vote Act of 2002 (HAVA) created the U.S. Election Assistance Commission (Commission) to assist States and insular areas (hereinafter referred to as States) with improving the administration of federal elections and to provide funds to States to help implement these improvements. The Commission administers payments to States authorized by HAVA under Titles I and II, as follows:

- Title I, Section 101 payments are for activities such as complying with HAVA requirements for uniform and nondiscriminatory election technology and administration requirements (Title III), improving the administration of elections for federal office, educating voters, training election officials and pool workers, and developing a State plan for requirements payments.

- Title I, Section 102 payments are available only for the replacement of punchcard and lever action voting systems.

- Title II, Section 251 requirements payments are for complying with Title III requirements for voting system equipment; and addressing provisional voting, voting information, Statewide voter registration lists, and voters who register by mail.

Exhibit 5

Title II also requires that states must:

- Have appropriated funds equal to five percent of the total amount to be spent for activities for which requirements payments are made.

- Maintain the expenditures of the State for activities funded by the requirements payment at a level that is not less than the expenditures maintained by the State for the fiscal year ending prior to November 2000.

- Establish an election fund for amounts appropriated by the State for carrying out activities for which requirements payments are made, for the Federal requirements payments received, for other amounts as may be appropriated under law and for interest earned on deposits of the fund.

**The Awardee – The Colorado Secretary of State**

The HAVA funds were awarded to the Governor of Colorado. The funds were administered by the Colorado Secretary of State, who is an elected official and is charged with the oversight of all elections, including administration of state election law, election official training, candidate filings, candidate certification, campaign finance and disclosure oversight, and compilation of election results. Elections in the State are administered at the county level by the county election officials.

**Use of HAVA Funds in Colorado**

Colorado's State Plan describes the history of EAC-funded activities in the State. Colorado requested and was granted a waiver to implement a statewide database of all registered voters by January 2006 rather than initial target date of January 2004. A competitive selection process led to a contract with a vendor that commenced in August 2004. Ultimately the effort was unsuccessful and the Colorado Secretary of State and the vendor mutually agreed to terminate the agreement in December 2005. Colorado ultimately engaged a contractor with proven experience in statewide voter databases to help the State fully implement a statewide system.

The objectives of the projects funded by HAVA, as set forth in the State Plan, were as follow:

Section 101 - $4.7 million to improve the administration of elections for federal office, administer HAVA in the State and comply with Title III requirements.

Section 102 - $2.2 million for the replacement of punch card voting systems in 682 qualifying precincts in five counties in the State. With interest earned on those funds, the state distributed over $2.3 million in 2005 and 2006 to Boulder, Jefferson, Mesa, Montrose, and Pitkin Counties who, prior to the August 2006 Primary Election, had replaced all punch-card equipment in the State.

Exhibit 5

<u>Title II Funds</u> - The State received approximately $39 million in Title II Funds. In addition, the State matched the Title II funds in the amount of approximately $2.6 million and earned interest of approximately $4.8 million. Through September 30, 2012, the amount of state and federal funds that have been available for the HAVA program totals $46.1 million. Title II funds were used primarily for the acquisition of Section 301 Compliant Voting Systems for counties in the State, including accessible systems, and to fund hardware, software, implementation services, project management, training, on-going maintenance, upgrades and related expenses required to implement and maintain the system. Remaining funds are expected to continue to support improvements in the administration of federal elections.

The Secretary of State established and is maintaining a Federal Elections Assistance Fund for the exclusive purpose of carrying out activities of HAVA. These activities included the distribution of funds to counties for use in acquiring certain election-related equipment.

## AUDIT OBJECTIVES

The objectives of our audit were to determine whether the Office:

1. Used payments authorized by Sections 101, 102, and 251 of the Grant in accordance with Grant and applicable requirements;

2. Accurately and properly accounted for property purchased with Grant payments and for program income;

3. Met HAVA requirements for Section 251 funds for creation of an election fund, providing required matching contributions, and meeting the requirements for maintenance of a base level of state outlays, commonly referred to as Maintenance of Expenditures (MOE).

In addition to accounting for Grant payments, the Grant requires states to maintain records that are consistent with sound accounting principles that fully disclose the amount and disposition of the payments, that identify the project costs financed with the payments and other sources, and that will facilitate an effective audit. The Commission requires states receiving Grant funds to comply with certain financial management requirements, specifically:

- Comply with the *Uniform Administrative Requirements for Grants and Cooperative Agreements with State and Local government,* 41 CFR 105-71, (originally Office of Management and Budget Circular A-102, also known as the "Common Rule").

- Expend payments in accordance with cost principles set forth in *Cost Principles for State and Local Governments*, 2 CFR 225, (originally Office of Management and Budget Circular A-87) for establishing the allowability or unallowability of certain items of cost for federal participation.

- Follow the requirements of the Federal Cash Management and Improvement Act.

Exhibit 5

- Submit detailed annual financial reports on the use of Title I and Title II payments.

- Comply with the provisions of *Audits of States, Local governments and Non-Profit Organizations* (Office of Management and Budget Circular A-133).

## SCOPE AND METHODOLOGY

We audited the Grant funds received and disbursed by the Office from April 28, 2003 through September 30, 2012 as shown in the following table:

| TYPE OF PAYMENT | FUNDS RECEIVED | | | | FUNDS DISBURSED |
|---|---|---|---|---|---|
| | EAC PAYMENT | STATE MATCH | INTEREST EARNED | TOTAL AVAILABLE | |
| Section 101 | $ 4,860,301 | $ - | $ 877,904 | $ 5,738,205 | $ 4,344,472 |
| Section 102 | 2,177,095 | - | 146,757 | 2,323,852 | 2,323,852 |
| Section 251 | 38,767,048 | 2,584,985 | 4,767,253 | 46,119,286 | 44,825,821 |
| Total | $45,804,444 | $ 2,584,985 | $5,791,914 | $54,181,343 | $ 51,494,145 |

Notes to Table of Funds Received and Disbursed:

(1) The Required State Match is $2,040,371. The State reports expending more on Section 251-eligible projects ($2,584,985) than the matching requirement. The State Match also includes approximately $194,967 of interest earned on matching contributions.

(2) The Federal Financial Report for the period ended September 30, 2012 was not filed as of the date of our audit fieldwork and documentation that the amounts reported are supported by and agree to the Office's accounting records has not been provided or analyzed.

Our audit methodology is set forth in Appendix B.

## AUDIT RESULTS

We conducted this performance audit in accordance with *Generally Accepted Government Auditing Standards*. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on the audit objectives.

Based on the audit procedures performed, except for the matters discussed below, we concluded that the Office accounted for and expended the HAVA funds in accordance with the

Exhibit 5

requirements mentioned above for the period from April 28, 2003 through September 30, 2012. The exceptions to applicable compliance requirements are described below.

**Finding No. 1 – Financial Reporting**

The Office's procedures to demonstrate the accuracy and completeness of Federal financial reports Forms 269 and 425, filed with the EAC, should be fully documented and include retention of submitted reports including underlying reconciliations to the formal accounting records.

Accurate and complete Federal financial reports are required by the grant award agreements and Federal regulations including specifically HAVA regulations. The EAC provides guidance on the preparation of the annual reports on its website.

The terms and conditions of the HAVA awards require the submission of accurate and complete Federal Forms 269 (Financial Status Report) and 425 (Federal Financial Report) which reflect the uses of award funds and the interest and program income generated from those funds. HAVA Title IX, Section 902. AUDITS AND REPAYMENT OF FUNDS, Part (a) – Recordkeeping Requirement states, "Each recipient of a grant or other payment made under this Act shall keep such records with respect to the payment as are consistent with sound accounting principles, including records which fully disclose the amount and disposition by such recipient of funds, the total cost of the project or undertaking for which such funds are used, and the amount of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit."

Recipients of federal assistance for HAVA Section 101, 102 and 251 program activities are required to file with EAC annual SF-269s for each type of funding. The SF-269 for HAVA Section 101 funds is due at the end of February covering the prior calendar year.

A prior audit conducted by an independent certified public accounting firm and also reported by the State Auditor in its 2007 Single Audit Report conducted pursuant to Office of Management and Budget Circular A-133 reported instances of incorrectly reporting HAVA expenditures and interest income earned on HAVA funds and inability of the Office to completely reconcile accounting records to Federal reports. The Office subsequently submitted revised reports which the EAC found to be acceptable and indicative of appropriate corrective action.

This audit validated on a test basis the correction of the deficiencies identified by prior auditors and reviewed selected Federal financial reports files subsequent to the prior audit period. We found that the Federal financial reports submitted by the Office could not be readily reconciled to the accounting records for reasons that consisted primarily of differences in the fiscal year end used for reporting purposes from that used by the State's accounting system and year-end accounting entries to transfer costs from the EAC fund to other funds, and records other correcting entries. For example, the Section 101 expenditures were reported on a calendar year basis, the Section 251 expenditures were reported on a fiscal year ending September 30, and the State's fiscal year ends, and the general ledger is closed, on June 30.

Exhibit 5

The Office was initially unable to provide Federal Forms 269 and 425 for all years of the awards and was unable to provide documentation as to how the reports reconciled to or were supported by the general ledger. This limited documentation was largely caused by the retirement of the HAVA Budget/Policy at June 30, 2012, and an inadequate understanding of the filing system and accounting documentation related to the EAC award.

The Office has not had specific procedures to guide and explain the reconciling items necessary to support the Federal reports. Documented reconciliations between the accounting records and the Federal reports exist; however, reconciling items are not consistently explained. Accordingly, agreement of the Federal reports to the accounting records requires verbal explanation, research and assistance from Office staff. With the assistance of the former HAVA Budget/Policy, we were able to determine that the Federal reports tested were in substantial agreement with the accounting records, with only a minor difference of approximately $5,845 on the 2010 Federal Financial Report for Title I, Section 101.

The difficulty encountered in validating the Federal reports highlights the need for procedures to ensure that periodic reconciliations are performed and reconciling items fully explained in order to confirm that the disbursements listed on spreadsheets of expenditures used as a basis for the Federal reports agree with amounts listed in the State's accounting system for the Election Fund used to account for HAVA-related revenues and expenditures.

We also noted that the Federal reports for fiscal year 2012, although due 90 days after the September 30, 2012 year end, was not submitted until May 2013, resulting in a delinquency of approximately 5 months.

The absence of written guidelines for the preparation, documentation and timely submission of Federal reports and related policies for their review and approval may allow inaccurate or noncompliant reports to be submitted to the EAC, placing the Office at risk for sanctions.

The retirement of the HAVA Budget/Policy Analyst left the Office without personnel knowledgeable about the location, content or basis for reports submitted to the EAC in prior years. This situation was exacerbated by the absence of complete and detailed written documentation to support Federal reports submitted throughout the award. Further, the absence of an individual charged with ensuring compliance with grant administrative requirements has likely contributed to the delinquency in preparing and submitting subsequent reports.

**Recommendation**

The EAC should require the Office to strengthen its controls over HAVA fund management by implementing the following procedures:

1. Creating and documenting procedures which ensure all expenditures of EAC funds can be reconciled to the general ledger and that all adjustments are fully documented and submitted to management review,

Exhibit 5

2. Implementing a supervisory review process to ensure the Federal reports are reviewed and agreed to the underlying reconciliation by management personnel independent from the preparer, and that such reports properly apply relevant EAC regulations,

3. Resolving the $5,845 of excess expenditure of Section 101 funds reported on the fiscal year 2010 report.

**Secretary of the State's Response:**

The Office agreed with the auditor's findings and also agreed with the auditor's recommendations. The Office stated that it would work with the EAC to resolve the $5,845 discrepancy identified on the Section 101 federal financial report for fiscal year 2010.

**Auditor's Response:**

The procedural changes as described should adequately address the concerns identified during the audit.

**Finding No. 2 – Equipment Management**

The Office's systems for monitoring EAC-funded equipment residing at county locations should be strengthened, and inventory records of equipment residing at the State's offices should be expanded, to ensure compliance with Federal regulations.

The terms of the HAVA award required the Office to adhere to certain federal laws and regulations. The counties, by approving the Intergovernmental Subgrant Agreement with the Office, also agree to adhere to "all terms and conditions that CDOS (the Office) has agreed to as a condition of receiving federal funding under HAVA." One of these, 41 CFR 105-71.132 (d), (the Common Rule) states that, "Procedures for managing equipment (including replacement equipment), whether acquired in whole or in part with grant funds, until disposition takes place will, as a minimum, meet the following requirements: (1) Property records must be maintained that include a description of the property, a serial number or other identification number, the source of property, who holds the title, the acquisition date, and cost of the property, percentage of Federal participation in the cost of the property, the location, use and condition of the property, and any ultimate disposition data including the data of disposal and sale price of the property. (2) A physical inventory of the property must be taken and the results reconciled with the property records at least once every two years."

The Office purchased EAC-funded equipment for use at the Office and also for use by Colorado counties. The counties received reimbursement for HAVA-eligible equipment pursuant to an agreement with the Office which outlined each county's responsibilities as it related to performance and compliance with applicable regulations. Counties were required to submit proof of purchase in order to request and receive reimbursement from the Office. Each county was required to sign confirmation of receipt for any equipment received from the State related to the goals of the grant.

Exhibit 5

Subsequent to acquisition, the counties (and the Office) were required to prepare and maintain complete inventory records setting forth the specific information required by the Common Rule as noted above. The Office's inventory listing omitted the location, use and condition of the property, or disposition data including the date of disposal and sale price of the property. Our review of inventory procedures at county locations revealed that, while the equipment was found to be consistent with the inventory listing, affixed with an identifying inventory tag, in usable condition and in fact being used as intended, county officials were not uniformly aware of the Common Rule inventory requirement with respect to the information to be maintained on property records.

The Common Rule also requires a bi-annual inventory of Federally-financed equipment. Colorado counties are required to conduct an inventory of all election-related equipment prior to each election. The Office required the counties to submit inventory listings and assigned individuals from the Office's Elections Division to visit selected counties, validate the listing, and observe security measures. The resulting inventory listings documenting the procedures performed by Election Division personnel revealed that all EAC-funded equipment was accounted for, or, if not located, was identified as either broken, transferred to another county, or, in the case of one county, sold back to the original vendor. This last instance occurred because the voting machines were found to be in excess of those required for elections, and the county considered the equipment to be fully depreciated. Remaining equipment included comparable voting machines which had been financed with County monies (not EAC funds) and, accordingly, the minor amount of proceeds from the sale of equipment was more than offset by the County's contribution to the cost of comparable equipment.

The Office's equipment inventory monitoring process generally revealed that equipment located at the counties was accounted for. It did, however, identify weaknesses in the extent and content of inventory records and highlighted the importance of noting on the inventory tags that equipment was financed with Federal funds, in order to ensure that the proceeds from disposition of such equipment are properly returned to the Federal government or used for eligible program purposes. Additionally, while the Office's county monitoring process provided assurance with respect to the existence of the EAC-financed equipment, this one-time effort does not meet the requirements for a bi-annual inventory as required by the Common Rule.

Inventory records maintained by the Office do not include the location, use and condition of the property, or disposition data including the date of disposal and sale price of the property. Additionally, a documented bi-annual physical inventory including inventory held at county locations is not completed by the Office.

Adequate property records and bi-annual physical inventories aid in the safeguarding of equipment purchased with Federal funds. A documented physical inventory also provides assurance that inventory items actually exist, are in working condition and are being used for their intended purpose.

The exceptions noted with respect to the Office's equipment management system occurred because of confusion with respect to the accounting and physical inspection requirements associated with Federally-financed equipment.

Exhibit 5

**Recommendation**

We recommend that the EAC require the Office to implement the following procedures:

1. Populate all fields included in the Office's inventory system and add fields to document use and condition, and disposal information,

2. Inform counties of the Common Rule requirements with respect to equipment management, accounting, safeguarding and disposition, and

3. Complete a physical observation of all inventory items on at least a bi-annual basis, including procedures to ensure compliance with the Common Rule.

**Secretary of the State's Response:**

The Office disagreed with the premise that inventory records and inspections are required for equipment purchased in 2006, asserting that, because the EAC had not issued guidelines specific to election equipment depreciation, this equipment could be considered fully depreciated and no further inventory or record-keeping procedures were required. However, the Office agreed to work with the Colorado County Clerks and Recorders to complete the inventory records in accordance with the Common Rule, and to implement procedures to ensure that Office personnel conduct a physical inventory of equipment purchased with HAVA dollars on a bi-annual basis in accordance with federal requirements.

**Auditor's Response:**

The Office's response does not acknowledge the terms of the grant award which requires the Office to adhere to the Common Rule, more formally known as the *Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments*. The subaward agreements with the counties also require that their adherence to the Common Rule. Accordingly, the response does not adequately address the finding.

**Finding No. 3 – Improper Use of HAVA Award Funds**

The Office expended HAVA funds for purposes that are not allowable under the award's terms and conditions or HAVA regulations.

HAVA authorizes payments to states under Titles I and II as follows:

- Title I, Section 101 payments are for activities such as complying with Title III of HAVA for uniform and nondiscriminatory election technology and administration requirements, improving the administration of elections for Federal office, educating voters, training election officials and poll workers, and developing a state plan for requirements payments.

Exhibit 5

- Title I, Section 102 payments are available only for the replacement of punch card and lever action voting systems.

- Title II, Section 251 requirements payments are for complying with Title III requirements for voting system equipment; and for addressing provisional voting, voting information, statewide voter registration lists, and voters who register by mail.

The EAC, in its Funding Advisory Opinion FAO-08-005, concluded that HAVA funds may be used for voter registration activities as follows:

- Section 101(b)(1)(C) allows Section 101 funds to be used for educating voters concerning voting procedures.

- Section 251(b)(1) allows Section 251 funds to be used to implement and maintain a computerized statewide voter registration list and to publicly post on the day of each election for Federal office instructions on how to vote, including how to cast a vote and how to cast a provisional ballot.

HAVA also mandates that the states adhere to various federal regulations with respect to grants management and apply sound accounting practices, including effective internal control systems, related to the receipt and use of Federal HAVA funds.

In its 2003 Help America Vote Act State Plan submitted by the then Secretary of State, the Office stated that the EAC Fund "will be administered by the Secretary of State in accordance with the financial controls and accounting standards required by Colorado and federal law. Such controls and standards involve legal responsibilities carried out by the State Controller, the State Treasurer, and the State Auditor. (See, for example, sections 2-3-103, 24-22-107, and 24-30-201, Colorado Revised Statutes.)"

The Code of Federal Regulations, specifically 41 CFR §105-71, *Uniform Administrative Requirements For Grants And Cooperative Agreements With State And Local Governments,* addresses Standards for Financial Management and Procurement Standards to be used by recipients of federal funds. Selected requirements include the following:

- Section 105-71.120, Standards for Financial Management Systems, (a) A State must expend and account for grant funds in accordance with State laws and procedures for expending and accounting for its own funds.

- Section 105–71.136 Procurement. (a) States. When procuring property and services under a grant, a State will allow the same policies and procedures it uses for procurements from its non-Federal funds. The State will ensure that every purchase order or other contract includes any clauses required by Federal statutes and executive orders and their implementing regulations.

Exhibit 5

The Code of Federal Regulations, specifically 2 CFR 225, *Cost Principles for State, Local and Indian Tribal Governments*, Appendix A to Part 225 - General Principles for Determining Allowable Costs states the following:

- Section 2. Policy guides, a.(1) Governmental units are responsible for the efficient and effective administration of Federal awards through the application of sound management practices.

- Section C. Basic Guidelines, 1. Factors affecting allowability of costs. To be allowable under Federal awards, costs must meet the following general criteria:

  a. Be necessary and reasonable for proper and efficient performance and administration of Federal awards.

  e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit.

- Section C. Basic Guidelines, 2. Reasonable costs. In determining reasonableness of a given cost, consideration shall be given to:

  a. Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the governmental unit or the performance of the Federal award.

  b. The restraints or requirements imposed by such factors as: Sound business practices; arm's-length bargaining; Federal, State and other laws and regulations; and, terms and conditions of the Federal award.

  c. Market prices for comparable goods or services.

  d. Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government.

  e. Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost.

The State of Colorado Fiscal Rules has, as its stated purpose "to set forth policies for state agencies and institutions of higher education concerning internal controls, accounting policies, and financial reporting for the State of Colorado." These rules include Rule 2-2, Section 3 which requires that disbursements by State Agencies larger than $5,000 in amount be supported by a commitment voucher.  The commitment voucher must adequately define the requirements, respective performance obligations of the parties, and pricing; include certain terms and conditions; comply with applicable statutes, executive orders, rules and policies; and include prices or rates that are fair and reasonable. Section 4 presents the State requirement that all agreements for services exceeding $100,000 in value must be in the form of a State Contract.

Exhibit 5

The State of Colorado Procurement Manual addresses competitive procurement processes, noting "Service and construction projects costing between $25,000 and $150,000 may be purchased using the document quote process under R §24-103-204-03. The Procurement Rules require formal Solicitation of competitive Bids for Procurements in excess of $150,000". The document quote process is a process of soliciting informally for fulfilling the State's need for a specific products or service and receiving and evaluating vendor responses. This process may be conducted only by a procurement officer or designee, and quotes obtained using the document quote process must be published in BIDS. BIDS is a web site designed to notify interested suppliers of the State of Colorado's intent to purchase goods or services competitively. Colorado BIDS acts as a centralized clearing house of information on bidding opportunities for State agencies and interested, prospective vendors. In the event of negotiated contracts, the Procurement Manual requires that "After selection, the Agency/IHE must then document the discussion and the basis for making its determination".

The State of Colorado Procurement Manual also provides a framework for "improving procurement related processes and practices", and includes a Procurement Code of Ethics. It addresses the Statement of Work to be included in each contract for services, noting "SOWs are critical to Contracts and should include as clear, comprehensive, and concise a statement of the Vendor's Obligations, i.e. what they are to do, as possible. SOWs should also (a) delineate performance measures for Vendors and the State's Obligations, if any beyond payment, and (b) to the extent relevant, set forth the how, where, when, and by whom of performance. Clear, comprehensive and concise SOWs are the key to avoiding Disputes and possible litigation with Vendors".

During the summer of 2012, the Office charged $356,846 to an account entitled "Marketing – Public Relations", for activities associated with an initiative described on the Office's web site as the "2012 Voter Registration Campaign". These costs included small payments to media outlets and $348,480 of payments to three contractors, none of which were made pursuant to a contract or through competitive solicitation.

The nature of the 2012 Voter Registration Campaign costs were media communications consisting of advertisements and communications through media including newspapers, television, radio and web-site video postings. The media spots were focused primarily on encouraging eligible residents to register to vote. Messages included statements such as "Go to GoVoteColorado.com" and "Make Colorado #1 in Voter Registration". Television and radio advertisements included numerous interviews with members of the public, asking whether they were registered to vote.

As described by the Deputy Secretary of State, the print ads include the deadline for voter registration and the web site url for voter registration, which she deemed to be the "educational" component. She noted that she had insisted that this portion of the message be included.

In its above-referenced Funding Advisory Opinion, the EAC noted that, while Section 101 funds may be used for educating voters concerning voting procedures, the phrases "educating voters on voting procedures" and "how to cast a vote" would include providing instruction on how to register to vote as one could not vote if not registered. However, voter registration activities do

Exhibit 5

not qualify for funding under the umbrella of improvements to the administration of elections for Federal office because the activities do not directly contribute to the administration of a Federal election."

The Funding Advisory Opinion further notes that "Neither Section 101 nor 251 funds may be used to conduct voter registration drives or get out the vote efforts; including advertising for the event, setting up booths, and paying salaries of employees who register new voters. Neither Section 101 or 251 funds can be used for "get out the vote" activities. In those cases where it is not clear whether a registration activity is educational or a get out the vote effort (i.e. encouraging citizens to vote on Election Day), the State should contact EAC for a determination on the basis of the specific circumstances."

Of the three firms used for this campaign, only one of the firms had previously provided services to the Office. Another firm was created on June 28, 2012, and was selected to coordinate the media efforts beginning in July of 2012. A third firm was brought to the project by the newly created campaign coordinating contractor.

Considering that there was no formal solicitation for services, during which the vendors could have provided and documented their ability to perform the specific services requested, it is unclear how the Office determined that these firms were in fact responsible contractors who possess the potential ability to perform successfully under the terms and conditions of the proposed procurement, as required by federal regulations. Further, absent an open solicitation for services from qualified vendors, the procurement was not conducted in a manner to provide, to the maximum extent practical, open and free competition and ensure that market rates were paid for the services rendered, and was not consistent with the State's Procurement Manual.

The absence of any contracts for these three firms, two of which was paid more than $100,000 for their services, setting forth the requirements and obligations of the vendors and the Office, even though mandated by federal regulations, also places the Office in violation of the State's own Fiscal Rules which require contracts for purchases of services in excess of $100,000.

Finally, adequate procurement records were not prepared or maintained, as required by federal regulations and the State's Procurement Manual, documenting the basis for contractor selection; justification for lack of competition when competitive bids or offers are not obtained; and basis for award cost or price.

In addition to the $356,846 of "Public Relations" costs including $348,480 in payments to these three firms between July and September 2012, we noted that additional media-related costs approximating $500,000 were recorded in the general ledger as expenditures charged to the HAVA fund through January 2013.

We were advised by Office management, including the Deputy Secretary of State and the Office's Chief of Staff, that the reason for these sole source vendor selections was due to a lack of time to create the voter registration campaign prior to the Oct 9 voter registration deadline. The State does not mandate adherence to the State of Colorado Fiscal Rules or the State's Procurement Manual by elected State officials, including the Secretary of State. However, all of

Exhibit 5

the charges to the HAVA award tested, other than those pertaining to the Voter Registration/Media Campaign, followed the procedures set forth in the <u>Fiscal Rules</u> and <u>Procurement Manual</u>. Selection of the 3 firms providing media-related services did not follow these established procedures, which specify, among other subjects, content and required approvals for State contracts and requirements for competition, accounting and monitoring of contracts. Rather, the documentation accompanying payment to these 3 vendors notes that, per the Office's Chief of Staff, the Secretary of State is exercising his "Elected Official Exemption" and is therefore not required to adhere to the procedures contained in the State's <u>Fiscal Rules</u> or <u>Procurement Manual</u>.

Colorado Revised Statues Section 24-101-105 is referenced in the State's <u>Procurement Manual</u>, which states the following:

> The Procurement Code applies to all publicly funded Contracts entered into by all governmental bodies of the State executive branch, with the exception of: iv) Procurements by Legislative and Judicial Branches and the four elected officials in the Executive Branch: Governor, Treasurer, Secretary of State, and Attorney General. This exemption is personal to the elected official and may not be used by departments, offices, or Agencies under their direction.

The exercise of an exemption from the financial management and internal control processes established for use by the State of Colorado is not consistent with federal award requirements for the following reasons:

1. The exemption is personal to the elected official. As noted above, Federal regulations, specifically the Common Rule, 41 CFR 105-71.136, provide that, a State may follow the same policies and procedures it uses for procurements from its non-Federal funds. The HAVA award was made to the State of Colorado, not to the elected Secretary of State, and the State's approved policies and procedures were applicable to the administration of the award; not a special exemption available only to certain elected officials of the State.

2. Utilizing this exemption to incur costs charged to the HAVA award is inconsistent with the Office's HAVA State Plan, which commits that the EAC Fund "will be administered by the Secretary of State in accordance with the financial controls and accounting standards required by Colorado and federal law". Federal law does not allow a State to opt out of any adopted system of internal controls.

3. There was no documentation from the Secretary of State or his deputy justifying the decision not to adhere to the State's Fiscal Rules or to applicable federal regulations.

Sound business practices and internal control concepts recognize that decisions to ignore approved and established policies and procedures should be justified and documented. Federal regulations establish that all procurement transactions should be conducted in a manner providing full and open competition. Noncompetitive procurements should only be used in situations in which the use of competitive proposals is not feasible, the service is available only from one vendor, or the public exigency or emergency for the requirement will not permit a

Exhibit 5

delay resulting from competitive solicitation; the awarding agency authorizes noncompetitive proposals, or, after solicitation of a number of sources, competition is determined inadequate. Regulations also state that cost analysis, i.e., verifying the proposed cost data, the projections of the data, and the evaluation of the specific elements of costs and profits, is required. Further, grantees must negotiate profit as a separate element of the price for each contract in which there is no price competition and in all cases where cost analysis is performed. All pre-award procurement documents may be reviewed by the awarding federal agency upon request.

In addition to the absence of a written contract, invoices submitted did not provide the level of detail to support whether the State or Federal governments had received comparable value in exchange for the amounts billed and paid. We were provided examples of the broad requests set forth on sample invoices, including one vendor's invoice for $82,515 which described the service rendered as "50% of Media Campaign Production - Delivered Director's Treatment." The description provided by another vendor of its proposed services did not include any services that would likely be considered an allowable use of HAVA funds.

One purchase order description was limited to "Media Campaign". The related proposal in the amount of $850,000 identified deliverables to be "Television, Newspaper, Radio, Interactive". The objective, as stated by this vendor, was to "create an integrated awareness campaign targeting Colorado residents that:

- Increases voter registration in Colorado

- Educates residents on why registering and voting is so important

- Creates recognition for the work being done by Colorado Department of State

- Raises the profile of the Secretary of State's office

- Launches our new communications strategy and messaging."

None of the objectives cited above constitute an allowable use of HAVA funds.

Our audit procedures revealed that both the HAVA Budget/Policy Analyst and the Chief Financial Officer questioned the use of HAVA funds for a voter registration/media campaign and advised Office management against charging the costs to the HAVA award. Documentation of these communications include emails setting forth the results of specific inquiries to the EAC during a web-based seminar, noting that "The basic answer was that costs for voter registration activities are not allowable costs under HAVA" and advising management to "ask the EAC for a determination if the costs are allowable" prior to charging any voter registration-related costs. We also viewed a Weekly Update memorandum to the Secretary of State, Deputy Secretary of State, Chief of Staff and other top management which cited allowable uses of HAVA funds and highlighted as an *unallowable use* "encouraging citizens to register to vote or to vote".

We were also advised by the Deputy Secretary of State that the Office had requested the media outlets to run the media spots as public service announcements, but the outlets refused to do so,

Exhibit 5

stating that they did not believe the advertisements met the requirements associated with this category. One television channel noted that they viewed the advertisements as too political in nature to qualify for public service treatment.

The above-described contractual services associated with the voter registration campaign include only an incidental educational component; accordingly these costs are not eligible for reimbursement from HAVA award funds. These costs are further questioned because the Office did not adhere to the internal control and financial management practices mandated by Federal law. Therefore, costs of $315,830 charged through September 30, 2012, are questioned as to their allowability under the terms of the HAVA award.

Failure to adhere to internal control concepts and Federal and state laws with respect to procurement and contracting practices increases the likelihood that unallowable costs and noncompliance with grantor and regulatory requirements may occur and remain undetected.

The charging of the above-described questioned costs to the HAVA award occurred because the Office did not adhere to prescribed practices and controls surrounding the purchasing and payment processes. Senior management of the Office initiated, directed and approved the expenditure of HAVA funds for unauthorized purposes, in violation of competitive procurement procedures, required Federal regulations, and State Fiscal Rules, over the objections of the Chief Financial Officer and the HAVA Budget/Policy Analyst.

**Recommendation**

We recommend the EAC require the Office to implement the following procedures:

1. Establish, document and communicate internal control policies and procedures that ensure adherence to applicable Federal regulations

2. Establish, document and communicate internal control policies and procedures that ensure any use of the Election Official Exemption is permitted by federal grantors, if involving federal award, authorized in accordance with the State's Fiscal Rules and that the rationale for its use if documented,

3. Establish, document and communicate internal control policies and procedures that preclude the opportunity for management override of established internal control procedures,

4. Establish, document and communicate internal control policies and procedures that ensure no payments are made without appropriate detail as to the rates, quantities, costs, deliverables, and authority supporting such payments,

5. Remove all costs associated with the Voter Registration Campaign charged through the end of this audit period, September 30, 2012,

Exhibit 5

6. Request a certification that no costs associated with the Voter Registration Campaign, other than the $356,846 of costs discussed above, have been charged to the HAVA award for the period from award inception in April 28, of 2003 to September 30, 2012, and

7. Request a certification that no costs associated with the Voter Registration Campaign have been charged to the HAVA award subsequent to September 30, 2012, and also request supporting verification of this certification in the form of a detail general ledger for the HAVA Election Fund. To the extent that Voter Registration Campaign costs have been charged to the HAVA award subsequent to September 30, 2012, these costs should be evaluated for potential disallowance and return to the EAC.

**Secretary of the State's Response:**

The Office disagreed with the finding, stating that the media campaign was sufficiently focused on educating voters as to be an allowable use of HAVA funds, and that the HAVA Budget/Policy Analyst agreed with this assessment and the CFO approved the expenditures. The Office also noted that the Secretary of State has the option of asserting the Elected Officials Exemption, properly exercised that option and was therefore exempt from the State's Fiscal Rules and Procurement Code. The Office states that "nothing in law required the Secretary to document or justify his use of the elected officials exemption." The Office also asserted that, "By complying with Colorado law, the Secretary of State necessarily complied with federal law when expending the HAVA funds."

**Auditor's Response:**

The Office's response is limited to the portions of the finding that cite the unallowable use of HAVA funds for a media campaign which primarily encourages citizens to register to vote, and on the right of the Office to exercise the Elected Official's Exemption under State Law. It does not address the lack of competitive procurement practices, basis for contractor selection, existence of written contracts for services, absence of detailed statement of work, or the lack of documentation of services performed to support vendor invoices

With respect to the issues that were addressed in the response, the auditors agree that there is an educational component to the media advertisements; however, it is a very small portion of the overall message. The vast majority of time consumed by the television and radio media spots is devoted to encouraging potential voters to register. Similarly, the primary use of space in the print media spots is to promote voter registration and not to educate voters on how to register to vote, with headline messages such as "Why should Colorado be #1 in voter registration?" and "Coloradans are leaders, not followers. Elections should be no different." Accordingly, the charging and financing of 100% of the voter registration campaign invoices to the HAVA award does not appear reasonable or consistent with the restrictions on the use of HAVA funds, and these costs remain questioned.

The Office argues that the internal controls and sound business practices which are embodied in the Colorado Fiscal Rules and Procurement Code, and which specifically require compliance with the Federal Common Rule, need not apply to the Secretary of State in the event that he exercises his Elected Official Exemption. However, as cited in this report,

Exhibit 5

Colorado pledged in its State Plan to administer the HAVA funds "in accordance with the financial controls and accounting standards required by Colorado and federal law". In fact, the State Plan references the very controls that the Office now argues are not applicable, including State Statute 24-22-107 which requires the State Controller to "preaudit and control the incurring of obligations;" which is accomplished through a mandatory pricing analysis, described in the State's Procurement Manual as a process in which the Controller or his delegate 'examines Contracts to determine if prices or rates are "fair and reasonable".' The important role of the State Controller, touted in the State Plan as evidence of the "financial controls and accounting standards" that would be used to control HAVA funds, is documented in the Colorado Fiscal Rules and the State's Procurement Code which the Office now asserts do not apply.

Further, Federal law governs the administration of Federal funds, and compliance with Federal law (2 CFR 225), as referenced in the report, was a condition of the EAC award. This law prohibits "Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost." Failure to use a competitive procurement process; failure to enter into a contract setting forth vendor responsibilities; failure to require from the contractor a written detailed scope of work; failure to obtain invoiced billings providing a comparable level of detail; and failure to require from the contractor per unit billing rates and invoiced billings setting forth the number of units (hours) worked at the agreed-upon hourly billing rate, all constitute deviations from the established practices of the State of Colorado as set forth in its Fiscal Rules and Procurement Manual, and constitute practices which may unjustifiably increase the Federal award's cost. Accordingly, the $315,830 of costs charged without benefit of these established practices remain questioned as to allowability.


## Other Matters

In addition to the responses specific to the audit findings, the Office asserted that the auditor did not obtain adequate audit evidence, did not possess sufficient legal training, and did not provide copies of selected audit documentation. The auditors note that the matters sited in this report are fully documented and supported. The documents requested by the Office were available from and could readily be obtained from Office Finance personnel. Further, the objectives of this performance audit were to test and evaluate compliance with the terms of a Federal award, and the audit does not involve the formulation or rendering of legal opinions.


We provided a draft of our report to the appropriate individuals of the Secretary of State's Office. We considered any comments received prior to finalizing this report.

The Office responded on October 10, 2013 and generally did not agree with the report's findings and recommendations. The Attorney General for the State of Colorado, in a letter dated November 11, 2013, also addressed the Office's concerns regarding the report. The EAC will need to work with the Office to resolve the issues and ensure appropriate corrective action. The

Exhibit 5

Office's complete response, excluding addendums to the letter which are available from the EAC Office of Inspector General, and the Attorney General's letter are included as Appendix A.

McBride, Lock & Associates performed the related audit procedures between February 4, 2013 and July 12, 2013.

*(Original Signed by McBride, Lock & Associates)*

McBride, Lock & Associates
July12, 2013

Exhibit 5

**Appendix A-1**

Exhibit 5



**STATE OF COLORADO**
**Department of State**

1700 Broadway
Suite 200
Denver, CO 80290

**Scott Gessler**
**Secretary of State**

**Suzanne Staiert**
**Deputy Secretary of State**

October 10, 2013

Mr. Curtis W. Crider
U.S. Election Assistance Commission
Office of Inspector General
1201 New York Avenue, NW - Suite 300
Washington, DC 20005

Dear Mr. Crider:

The Colorado Secretary of State's Office (the Office) has received and reviewed the Draft Audit Report (DAR). This letter contains a written response to the DAR.

**Finding No. 1 - Federal Reports**

The DAR states that, generally, the Office has no written guidelines for the preparation, documentation, and timely submission of federal reports and related policies. Specifically, the auditor found that "the Federal financial reports submitted by the Office could not be readily reconciled to the accounting records" for various reasons, including a difference between federal and state fiscal year reporting dates and the retirement of the Office's HAVA Budget/Policy Analyst. The DAR cites limited documentation, an inadequate understanding of the filing system, and, after the HAVA Budget/Policy Analyst's retirement, a lack of personnel knowledgeable about the location, content, or basis for reports. The auditor could not reconcile the reports without assistance from the retired employee.

*Secretary of State Response*

The Secretary of State's office agrees with the auditor's findings regarding federal reports and also agrees with the auditor's recommendations. The Office has already begun the process of examining how the Finance unit and the Chief Financial Officer create and document filing procedures to ensure the Office complies with federal reporting standards.

Furthermore, the Office agrees that it is unacceptable for the financial records to require verbal explanation, research, and assistance from employees who are no longer employed by the Office. In the Office's view, it was incumbent on the Chief Financial Officer to ensure that all Finance unit employees used proper documentation and reporting procedures. It was also incumbent on the Chief Financial Officer to facilitate the transfer of all duties from the retiring HAVA/Budget Analyst to another employee. The Office will work to ensure that the Finance unit operates in a consistent and uniform manner such that the unit's operations cannot be disrupted by employee turnover.

| Main Number | (303) 894-2200 | Web Site | www.sos.state.co.us |
| Fax | (303) 869-4861 | E-mail | public.elections@sos.state.co.us |
| TDD/TTY | (303) 869-4867 | | |

Exhibit 5

In addition to creating and documenting procedures that ensure all expenditures of EAC funds may be reconciled to the general ledger, the Office plans to implement, in accordance with the auditor's recommendation, a supervisory review process over the Finance unit to ensure that reports comply with federal standards and are submitted in a timely manner.

## Finding No. 2 - Equipment Management

The DAR asserts that "the Office's systems for monitoring EAC-funded equipment residing at county locations should be strengthened, and inventory records of equipment residing at the State's offices should be expanded, to ensure compliance with Federal regulations." More specifically, the DAR states that equipment-inventory records maintained by the Secretary of State's office do not include the location, use, and condition of the property, or disposition of data including the date of disposal and sale price of the property. The DAR also states that the Office fails to conduct a bi-annual physical inventory of equipment at county offices.

*Secretary of State Response*

Because the EAC has not issued any written guidance on election-equipment depreciation, counties in Colorado have historically applied standard accounting principles when calculating depreciation. Under these principles, the equipment purchased in 2006 has fully depreciated, meaning no equipment inventory is necessary.

Despite our previous position and in light of this audit, the Office will work with Colorado County Clerk and Recorders to complete the inventory records in accordance with the Common Rule. Additionally, the Office will implement procedures to ensure that Office personnel conduct a physical inventory of equipment purchased with HAVA dollars on a bi-annual basis in accordance with federal requirements.

The Office respectfully requests, however, that the EAC issue clear guidance on election equipment depreciation; in the absence of such guidance, states are likely to apply standard accounting principles, which apparently may not always align with complicated and vague HAVA requirements, and states should not be penalized for doing so.

## Finding No. 3 - Improper Use of HAVA Award Funds

In the DAR, the auditor asserts that "the Office expended HAVA funds for purposes that are not allowable under the award's terms and conditions or HAVA regulations. The auditor also claims that the Office violated state and federal procurement laws and procedures.

*Secretary of State Response*

### A. The public service announcement was an allowable use of HAVA funds.

The DAR argues that the education campaign was an unallowable cost. The Office disagrees with this finding.

Exhibit 5

2

1. *The PSA was an allowable use of Section 101 funds because its purpose was to educate voters on how to register to vote and how to update their voter registration information.*

The PSA for which the Office expended HAVA funds is exactly the type of campaign authorized by, and even encouraged by, the Help America Vote Act. HAVA authorizes payments to states under Section 101 of Title I as follows:

> Title I, Section 101 payments are for activities such as complying with Title III of HAVA for uniform and nondiscriminatory election technology and administration requirements, improving the administration of elections for Federal office, *educating voters*, training election officials and poll workers, and developing a state plan for requirements payments. (Emphasis added.)

The EAC, in Funding Advisory Opinion FAO-08-005 (the EAC's only official guidance to date on the use of Section 101 funds), confirmed that states may use HAVA monies to educate voters on voting procedures and how to cast a vote. The EAC went on to say that "In the opinion of the EAC, the phrases "educating voters on voting procedures" and "how to cast a vote" would include *providing instruction on how to register to vote as one could not vote if not registered*." (Emphasis added.) Also in the advisory opinion, the EAC states:

> Section 101 funds may be used at any time to instruct individuals on how to register to vote. This would include *print, radio, and television advertisements informing individuals about the need to register to cast a vote, where to register to vote, how to obtain registration forms, and how to complete the forms*. (Emphasis added.)

Here, the PSA was directly focused at educating eligible electors. In fact, each and every print and television ad included, in part, the following statement:

> **Go to GoVoteColorado.com by October 9th** to register to vote in the November election. You can also get a paper form from your county clerk and recorder's office. Remember, you must be 18 years old by Election Day, a U.S. citizen and a Colorado resident.

This statement directly parallels the allowable advertisements described in the EAC's advisory opinion. That is, the ad informs "individuals about the need to register to cast a vote," "where to register to vote," and "how to obtain registration forms."

In addition to the voter registration qualifications, the radio PSAs educated voters on the proper forms of identification needed to register or update registration information online. For example, one radio ad stated: "Register online with a driver's license or state ID card. It's easy. You must be at least 18 years old by Election Day, a US citizen, and a Colorado resident." As these examples indicate, the main purpose of the ads was to educate eligible electors on how to register to vote and how to update their registration information.

Exhibit 5

2. *Perhaps due to a lack of legal training, the auditor erroneously concluded that the Office could not use HAVA funds for the PSAs.*

In essence, the auditor arrives at an erroneous and unsupported legal conclusion, perhaps because she has no legal training. Conversely, several people from the Office spent a significant amount of time researching and analyzing whether the PSAs were an allowable use of HAVA funds. The following personnel, three of whom are attorneys, were involved in the decision process:

- <u>The Secretary of State</u>: The Secretary is the Chief Election Official for the State of Colorado and is charged by HAVA with the responsibility to enforce and implement the provisions of HAVA. The current Secretary of State is also an attorney with a significant background in election law. Here, the Secretary of State personally approved the HAVA expenditure and authorized the Chief of Staff to sign the billings.

- <u>The Deputy Secretary of State</u>: Colorado law gives the Deputy Secretary the full authority to act for the Secretary of State "in all things relating to the office."[1] The current Deputy Secretary is also an attorney with over two decades of experience in public-sector law, including time as a judge, and is directly accountable to the Secretary. In this instance, the Deputy Secretary reviewed the legal research and analysis and concluded that the PSAs were an acceptable use of HAVA funds.

- <u>The Chief of Staff</u>: The Chief of Staff is the appointing authority under Colorado law and is responsible for all staff activities. The Chief of Staff is also directly accountable to the Secretary. Here, the Chief of Staff, after receiving approval from the Secretary of State, signed the billings for the PSA campaign.

- <u>The Chief Financial Officer</u>: Among other things, the Chief Financial Officer gives final authorization to all Office expenditures, including HAVA expenditures. The Chief Financial Officer, in this instance, gave final approval to the expenditure.

- <u>The Legal and Policy Manager</u>: Among other duties, the Legal and Policy Manager oversees and conducts legal research for the Office, most-often in the elections realm. The current Legal and Policy manager is an attorney with over five years of election law experience. Here, the Legal and Policy Manager conducted in-depth legal review of HAVA, EAC Advisory Opinions, audits of other states, and applicable state law to reach the conclusion that the PSAs were an acceptable use of HAVA funds. The Legal and Policy Manager also had extensive discussions with the HAVA Budget/Policy Analyst, who reached the same conclusion.

- <u>The HAVA Budget/Policy Analyst</u>: Though now retired, the person who filled the HAVA Budget/Policy Analyst role with the Office during the audit time period had over 20 years of experience and had been with the Office since HAVA's inception. As mentioned above, the HAVA Budget/Policy Analyst had extensive discussions with the Legal and Policy Manager and concluded that the PSAs were an allowable use of HAVA

---

[1] Section 24-21-105, C.R.S.

Exhibit 5

funds. The HAVA Budget/Policy Analyst also had several discussions with the Chief of Staff, who ultimately signed the billings.

In this instance, the Legal and Policy Manager spent significant time researching and analyzing Title 1, Section 101, of HAVA and the EAC's Funding Advisory Opinion FAO-08-005. The Legal and Policy Manager also spent significant time with the firms that created the voter education campaign to ensure that the PSAs centered on voter education. In fact, the Legal and Policy Manager rejected several of the proposals because, in his view, they did not fit within the parameters of section 101 and FAO-08-005. Additionally, due to the lack of EAC guidance on the issue, the Legal and Policy Manager reviewed relevant EAC audits of other states. After this thorough legal research and analysis, the Office worked with the vendor to carefully craft PSAs that meet the requirement for section 101 funds. Finally, the Legal and Policy Manager spoke with the HAVA Budget/Policy Analyst several times about the HAVA expenditure. Both agreed that the PSAs were an allowable use.

From the inception of the project, the Secretary of State, Deputy Secretary of State, and Chief of Staff spoke with the Chief Financial Officer, HAVA Budget/Policy Analyst, and Legal and Policy Manager. The Chief of Staff and the HAVA Budget/Policy Analyst discussed the expenditure at length. After one such discussion and before the audit, the HAVA Budget/Policy Analyst emailed a note to the Chief of Staff about the PSAs. Her note read: "The Department expended funds on educating voters concerning voting procedures, voting rights, and voting and was very careful to avoid promoting voting. The auditors may raise questions, but there should not be a finding."[2]

Finally, the Secretary of State and Deputy Secretary of State, who are both attorneys with a significant amount of experience, reviewed the PSAs, the relevant statutory authority, and the EAC's guidance and came to the conclusion that the PSAs were an allowable use of HAVA funds. As such, the Office objects to the auditor's faulty legal conclusion and reasserts that the PSAs are exactly the type of communication HAVA allows and even encourages.

**B. The Office complied with all applicable state and federal laws in asserting the "elected officials exemption," which allowed the Office to hire a vendor for the PSAs outside of standard procurement procedures.**

Colorado law specifically exempts elected officials from the Colorado Procurement Code and the Colorado Fiscal Rules. And because the Colorado Secretary of State is an elected official, he falls within the exemption. The auditor's claims to the contrary show that her legal analysis does not accurately interpret Colorado law.

    1.   *Under Colorado law, the Secretary of State is exempt from the Colorado Procurement Code.*

As the Deputy Secretary of State and Chief of Staff informed the auditor during her visit to the Office, the Secretary of State has the option of asserting the elected officials exemption, which allows the Office to move forward with vendor selections outside of the typical bidding process.

---

[2] Memo from HAVA Budget/Policy Analyst to Chief of Staff dated May 16, 2012

Exhibit 5

Part 1 of article 101 of title 24, C.R.S., (for example: 24-101-1xx) is known as the "Procurement Code" for the State of Colorado. The introductory portion to section 24-101-105 (1), C.R.S., states that the Procurement Code applies "to all publically funded contracts entered into by all governmental bodies of the executive branch of this state."

Section 24-101-301, C.R.S., defines the terms used in the Procurement Code. Subsection (10) of that section defines "Governmental body" as any "department, commission, council, board, bureau, committee, institution of higher education, agency, government corporation, or other establishment or official, *other than an elected official*, of the executive branch of state government in this state." (Emphasis added.)

These two sections, when read together, leave no doubt that an election official is exempt from Colorado's Procurement Code. And this exemption makes sense. Elected officials in Colorado are held to higher scrutiny and are directly accountable to the people of Colorado. Unlike the heads of other executive-branch departments, the Colorado Governor, Secretary of State, Attorney General, and Treasurer are elected to office, not appointed by some other entity. As such, if the people of Colorado don't agree with an elected official's financial decisions, they have the power to recall the official or vote him or her out of office. Conversely, the people of Colorado cannot directly remove the appointed directors of other agencies. The other agencies also typically have much larger staffs and budgets. When one considers Colorado's governmental makeup, it makes sense that the Procurement Code would apply to most executive branch departments but not to elected officials.

In sum, under Colorado law, the Secretary of State was not required to comply with the Procurement Code when expending HAVA funds for the PSAs. Any assertion to the contrary misinterprets the law.

> 2. *Colorado law also exempts the Secretary of State from the Colorado Fiscal Rules.*

The elected officials exemption goes beyond the Procurement Code to also exempt the Secretary of State from the state's Fiscal Rules.

Section 24-30-202 (13) (a), C.R.S., requires Colorado's Controller to promulgate fiscal rules to govern, among other things, financial-administration procedures. Paragraph (a) of subsection (13) states that the fiscal rules are binding on the several departments of the state.

But section 24-2-102 (4), C.R.S., states in relevant part that "Elective officers shall not be subject to the provisions of this article, *parts 2* and 11 *of article 30*, and articles 31, 35, 36, and *101* to 111 *of this title*." (Emphasis added.) Thus, elected officials are not subject to the Controller's Fiscal Rules, which are promulgated in accordance with *part 2 of article 30* of title 24.

As with the Procurement-Code exemption, it makes sense that elected officials are exempt from the state's Fiscal Rules. The Rules merely carry out the legislature's intent in adopting the Procurement Code.

Exhibit 5

Again, the Secretary of State properly invoked his exemption and was free to expend HAVA funds for the PSAs in the best manner he saw fit.

> 3. *By complying with Colorado law, the Secretary of State necessarily complied with federal law when expending the HAVA funds.*

Because federal law simply requires the Secretary of State to comply with state law when spending HAVA funds, and because the Secretary complied with Colorado law, he necessarily complied with federal law.

The auditor argues that use of the exemption violates federal law. But the federal regulation cited by the auditor simply says that a "State must expend and account for grant funds in accordance with State laws and procedures for extending and accounting for its own funds."[3] Here, the Office expended HAVA funds in the same manner it expends its own state funds. Thus, there can be no violation of federal law because there was no violation of state law.

The auditor also cites a federal regulation that states, in relevant part, "when procuring property and service under a grant, a State will allow the same policies and procedures it uses for procurements from its non-federal funds."[4] Again, the Office procured services in a manner consistent with state law and in a like manner as other non-federal monies. Therefore, the Office did not violate federal regulations.

> 4. *The Secretary of State also complied with federal policies and guidelines when expending the HAVA funds.*

The fact that the Secretary of State is exempt from the Procurement Code and Fiscal Rules does not mean that the Office does not apply sound business and purchasing principles. In this instance, the Office professionally and fiscally administered HAVA dollars. In the DAR, the auditor listed several of what appear to be federal "guidelines." Though the auditor makes no specific allegation in regard to the guidelines, the Office can only assume she included them in the DAR to allege a violation.

The auditor first cites a policy guide that states "Governmental units are responsible for the efficient and effective administration of Federal awards through the application of sound management practices."[5] Here, the Office administered the HAVA dollars through sound management practices. Use of the elected officials exemption does not equate to an unprincipled, unsound purchasing process. In fact, the Office hired three separate vendors, rather than just one, to effectuate the PSAs because the Office felt that doing so both saved money and produced the best results. Additionally, the Office tasked one of those vendors with developing "a strategic media plan that communicates the *Register to Vote* message as equally as possible within the entire state of Colorado."[6] The memo is just one example of the office's diligence in purchasing

---

[3] 41 CFR § 105-71.120
[4] 41 CFR § 105-71.136
[5] 2 CFR 225, Appendix A, Section 2. A. (1)
[6] Memo from Chessie Little of Thayer Media to Andrew Cole of the Secretary of State's Office dated August 27, 2012.

Exhibit 5

professional services related to the PSAs. Despite the auditor's allegations, the Office was selective in choosing vendors, and was thoroughly engaged in each step of the process.

Next, the auditor reproduces a basic guideline stating that, to be allowable under federal awards, costs must "be necessary and reasonable for proper and efficient performance and administration of Federal awards" and "be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit."[7] First, the Office absolutely used the HAVA monies for a necessary and reasonable purpose; educating Colorado voters is not only a fundamental aspect of the Secretary of State's mission, but also one of the stated purposes for HAVA awards. And the Secretary of State has asserted the elected officials exemption on several other occasions. As such, use of the exemption here was uniform to our other purchasing activities and was in line with federal policies and guidelines.

> 5. *Though he was not required to, the Secretary of State complied with the state's Procurement Manual because the exemption was personal to him.*

Colorado's Procurement Manual is meant to be used as a guide to supplement the Procurement Code and Fiscal Rules. The manual does not have the force of law and, even if it did, the Secretary of State complied with its recommendation that the exemption is personal to the elected official.

First, the auditor cites the Procurement Manual for the proposition that the elected officials exemption is personal to the elected official. But the Controller issues the procurement manual for guidance purposes only. In fact, Section 3. A. of the manual states that the manual does not overrule or replace Colorado's statutory law. As mentioned above, the Secretary of State is undoubtedly exempt from both the Procurement Code and the state's Fiscal Rules; a statement in the Procurement Manual cannot and does not override the language of the statutes.

Second, even if the Procurement Manual did have the force of law, the Secretary of State and all other elected officials would be exempt from its recommendations. Again, Colorado law states that the Procurement Code and rules promulgated in accordance with the Procurement Code do not apply to elected officials. If the manual had the force of law, it would necessarily be a rule promulgated by the Controller. Because elected officials are exempt from the Controller's rules, the Procurement Manual would not apply to the Secretary of State. Simply stated, the auditor is not free to pick and choose which provisions of Colorado laws and regulations have effect and which do not; elected officials are exempt from all procurement statutes and rules, period.

Third, assuming both that the Procurement Manual has the force of law and that its guidance applies to the Secretary of State, the elected officials exemption, as used in this instance, was personal to the Secretary of State, as the manual recommends. The Secretary of State himself approved the expenditure. Nothing was done without his knowledge, direction, and approval.

---

[7] 2 CFR 225, Appendix A, Section C, 1. a. and e.

Exhibit 5

6. *The Secretary of State, not the Governor, is the proper official to invoke the elected officials exemption.*

State law officially names the Secretary of State as the administrator of HAVA funds and, as such, it is the Secretary of State, not the Governor, who may use the elected officials exemption to disperse HAVA funds.

The auditor cites the initial letter that awarded HAVA funds to Colorado over a decade ago, seemingly for the proposition that the Secretary of State has no authority to control the funds. But in Colorado, the General Assembly gave the Secretary of State the authority to control HAVA funds. The legislature created the federal elections assistance fund in the state treasury to be administered by the Secretary of State.[8] The fund consists of "all moneys received by the state from the federal government pursuant to HAVA."[9] That statutory section continuously appropriates fund monies to the Secretary of State for the proper administration of HAVA. Thus, Colorado law specifically states that the Secretary of State, an elected official, administers HAVA funds. As such, the disbursement of HAVA is personal to the Secretary of State; no other state official or entity has control of the funds. And the federal government was aware of Colorado's law when it awarded HAVA funds to the state and never raised an objection. To assert that Colorado's elected official exemption violates the terms of the award ignores long-standing law.

Despite her initial argument that the funds were awarded to the Governor, the auditor then directly contradicts herself and argues that the Governor could not have used the exemption either, but switches her reasoning and claims the Governor couldn't use the exemption because he could not personally sign the contracts. That is, the auditor seems to be arguing that the Secretary can't use the exemption because the HAVA funds were sent to the Governor, but the Governor can't use the exemption because the funds are administered by the Secretary. The auditor can't have it both ways; there must be some elected official in Colorado who has the authority to use the exemption in the administration of HAVA funds. In truth, that official is the Secretary of State.

7. *Neither state nor federal law requires the Secretary of State to personally sign the contract and, as such, the Chief of Staff's signature is permissible.*

It is both legal and perfectly acceptable for the Chief of Staff to sign the billings related to the PSAs. In fact, the Colorado Attorney General's office, in a memo to the Secretary of State, concluded that "Due to the structure of the Secretary of State's office, the Elected Officials Exemption should apply to a signature applied by any member of the Secretary's senior staff, so long as the commitment has been expressly approved by the Secretary or Deputy Secretary of State.[10] Here, the Secretary's Chief of Staff signed the billings. Because the Secretary of State had knowledge of and approved the expenditures, it is immaterial that the Chief of Staff rather than the Secretary or Deputy Secretary signed the billings.

---

[8] Section 1-1.5-106 (1) (a), C.R.S.

[9] Section 1-1.5-106 (1) (a) (I), C.R.S.

[10] Attorney General Memo dated October 4, 2013.

Exhibit 5

Despite the Colorado Attorney General's analysis, the auditor relies on a decade-old memo from the Controller to the Governor's Office, which addressed that office's use of the elected officials exemption. In the DAR, the auditor states:

> Even without the existence of a written contract, the Fiscal Rules require the personal approval of the elected official. In an Issues Paper authored by the State Controller and dated March 12, 2001, the State Controller noted that "The exemption has been construed by the State Controller to extend to an elected official's deputy" and further states that "an elected official assumes a significant amount of risk each time he or she chooses to ignore the protections afforded in the Fiscal Rules and the Procurement Code. As a result, the elected official should personally approve each situation in which the Fiscal Rules and/or the Procurement Code are not complied with." Neither the Secretary of State nor his deputy personally signed any of the payment documents (purchase orders, invoices, payment vouchers) tested; all signatures were by the Office's Chief of Staff.

Again, the auditor cites "requirements" in the same fiscal rules from which the Secretary of State is exempt. Again, our response is that the fiscal rules don't apply in this instance.

Next, the Office wishes to point out that Issue Paper merely contains the Controller's own interpretations of the law. No state law describes how far or to whom the exemption may be extended. The Controller is not required to be an attorney and, while the Controller's interpretation of state law is often useful, his memos do not have the force and effect of law.

Additionally, the auditor fails to point out that the Controller, in his Issue Paper to the Governor, said that, in that particular instance, the Governor's Chief of Staff is also entitled to the exemption. In our case, the Secretary's Chief of Staff authorized the payments to the vendors. The auditor is elevating form over substance: she uses the Controller's memo to say that the exemption could only have been used by the Deputy Secretary of State, but never explains that the Controller, in that instance, extended the exemption to the Governor's Chief of Staff, nor does she cite the Controller's reasoning for extending the exemption beyond the elected official at all. Here, the Secretary of State had personal knowledge of the expenditures and personally authorized the Chief of Staff to approve the billings. Any assertion that the Deputy's signature, rather than the Chief of Staff's, somehow changes the material aspects of the disbursement just isn't legally sound.

Finally, the Office would like to reiterate that the Secretary of State personally approved the expenditures, in accordance with the Controller's memo. The auditor seems to think that because the Secretary did not sign the billings he did not personally approve them. Such a statement illustrates the auditor's lack of awareness of how the Office operates. To be sure, the Secretary of State does not personally draft, edit, and sign every document that leaves the Office. Rather, the Secretary relies on his top-level officials and their staff to give effect to his directives. We assume such a process is common among other state and federal government agencies.

Exhibit 5

8. *Neither state nor federal law requires an elected official to document or justify in writing the decision to use the elected officials exemption.*

Put plainly, nothing in federal or state law requires an elected official to justify his or her decision in writing to exercise the elected officials exemption. Despite the lack of any such requirements, the auditor alleges that the absence of documentation is a violation. The auditor, in the DAR, claims:

> There was no documentation from the Secretary of State or his deputy justifying the decision not to adhere to the State's Fiscal Rules or to applicable federal regulations. In the absence of such documentation from the Secretary of State or Deputy Secretary of State, the Chief Financial Officer created a document which her staff was instructed to attach to each invoice and purchase order stating that, per the Chief of Staff, the Secretary of State was exercising his Elected Official Exemption, citing the urgency of the media project.

Again, nothing in law required the Secretary to document or justify his use of the elected officials exemption. As such, the auditor's finding here is baseless and again highlights her lack of legal training. Additionally, any document created by the Chief Financial Officer was for internal record-keeping purposes only; there was no intent to adhere to a regulation that doesn't exist.

**Additional Office Concerns**

As a final and more-general note, the Office feels this response is the proper place to express our concern about the auditor's methodology and practices. While many of the specifics are listed above and need not be repeated here, the Office is troubled by several of the auditor's statements in the DAR.

**A. The auditor did not conduct the audit in accordance with Generally Accepted Government Auditing Standards.**

The auditor failed to follow basic Generally Accepted Government Auditing Standards, which require an auditor to obtain sufficient and appropriate evidence to provide a reasonable basis for the auditor's findings. Rather than auditing the Office's procedures, this particular DAR seems to substitute the auditor's faulty legal conclusions for the well-researched and analyzed legal conclusions of the Colorado General Assembly, the Colorado Attorney General, and the Colorado Secretary of State. To our knowledge, the auditor has no legal training and little experience with election administration. The Office specifically asked the auditing firm which individuals provided the legal analysis in both the NFR and the DAR but the firm didn't respond.

**B. The auditor's investigation was incomplete; she alleges that the HAVA Budget/Policy Analyst and the Chief Financial Officer told senior management that HAVA funds couldn't be used for the PSAs, yet she never interviewed any member of senior management about these alleged conversations.**

The auditor also makes unfounded conclusions based on comments apparently attributed to the Chief Financial Office and the HAVA Budget/Policy Analyst, comments that the auditor refused

Exhibit 5

to verify or corroborate and that are directly refuted by Office personnel. While the Office believes that an audit finding of poor communication or poor oversight may be warranted in certain situations, the auditor here went far beyond that and seems to actually assign blame to individuals in the Office without giving those individuals an opportunity to address the discrepancies. In sum, the auditor's investigation was incomplete at best and flawed at worst.

### C.  The audit firm rejected specific requests to produce documents related to the audit.

Finally, the Office asked the auditor on more than one occasion for documents she cites in her findings but the auditor either ignored the requests or refused to produce the documents. In an email to the auditing firm dated September 25, 2013, the Deputy Secretary of state wrote:

> The Draft Audit Report contains a lot of new information that your firm did not include in the NFR. Specifically, the draft report on page 17, cites documentation of communications between the HAVA Budget/Policy Analyst, the Chief Financial Officer, and office management that questioned the use of HAVA funds, including "emails setting forth the results of specific inquiries to the EAC during a web-based seminar" and a "Weekly Update memorandum to the Secretary of State, Deputy Secretary of State, Chief of Staff and other top management." Will you please provide us with copies of all the emails and other communications your firm cites in this portion of the draft report?

Despite this (and several other) direct requests, the auditing firm refused to even acknowledge the request, much less provide the documentation.

As we move forward in this process with the EAC, the Office would appreciate a more thorough, comprehensive, and principled approach.

The Colorado Secretary of State's Office appreciates the opportunity to review and comment on the DAR and looks forward to speaking with you in an exit interview. If you have any questions or require any additional information, please do not hesitate to contact me.


_____
Suzanne Staiert
Deputy Secretary of State

Exhibit 5

**Appendix A-2**

Exhibit 5

**John W. Suthers**
Attorney General

**Cynthia H. Coffman**
Chief Deputy Attorney General

**Daniel D. Domenico**
Solicitor General

# STATE OF COLORADO
## DEPARTMENT OF LAW

### State Services Section

**Ralph L. Carr**
**Colorado Judicial Center**
1300 Broadway, 6th Floor
Denver, Colorado 80203
Phone (720) 508-6000

November 11, 2013

Curtis Crider
Inspector General
U.S. Election Assistance Commission
1225 New York Ave., NW, Ste. 1100
Washington D.C. 20005

RE:    Colorado Secretary of State HAVA audit

Dear Mr. Crider:

Thank you for providing our client, the Colorado Secretary of State ("the Secretary"), with an additional opportunity to respond to the Draft Performance Audit Report prepared for the EAC by McBride, Lock & Associates.  I write to highlight several of the Secretary's remaining concerns with the contents of the audit report, and to ensure that those issues are preserved in the event that additional proceedings are necessary.

As we discussed in our previous phone conferences, the Secretary remains concerned primarily with Finding No. 3 of the audit report, in which the auditor concluded that "[t]he Office expended HAVA funds for purposes that are not allowable under the award's terms and conditions or HAVA regulations."  The reasoning and factfinding underlying this conclusion is flawed in several respects, and therefore should not be included in the final version of the draft report.  Specifically:

- The auditor relied heavily on its finding that the Secretary improperly exercised his elected officials' exemption to the Colorado Procurement Code in order to conclude that the questioned expenditures did not comply with the terms of the grant.  On one hand, this conclusion derives solely from the audit's detailed – albeit incorrect – analysis of applicable Colorado statutes and regulations.  On the other, it incongruously claims that "the audit does not involve the formulation or rendering of legal opinions."  As I have explained in a privileged

Exhibit 5

memorandum that I believe has been released to your office, whether the Secretary appropriately exercised his elected officials' exemption is not only a pure question of Colorado law, but it is one that the auditor answered incorrectly.  Given that the auditor's erroneous conclusion on this point underlies many of its subsequent conclusions about the propriety of the questioned expenditures, the retention of this finding casts doubt on the accuracy of the audit report as a whole.

- Several glaring factual errors remain in the draft audit report despite the fact that the Secretary has repeatedly pointed them out during previous discussions.  Most prominent is the auditor's failure to recognize the chronology of the internal email discussions surrounding the Secretary's use of the HAVA grant.  In short, the audit relies heavily on internal communications discussing *general* HAVA compliance requirements, while overlooking subsequent communications in which the Secretary's finance staff reviewed – and approving – the *specific* proposed expenditures that are at issue here.

- Similarly, the auditor either misunderstands or simply misrepresents the circumstances surrounding the media buy and, as a result, concludes that media outlets "refused" to run the spots as public service announcements because "they did not believe the advertisements met the requirements associated with this category."  The media buy was conducted by a professional buyer and had nothing to do with public service announcements.  Based on its attorney's interpretation of FCC regulations, one outlet (out of more than 100) did request that the spot disclose its funding source, but this disclosure sheds no light on whether the use of HAVA funds was proper.

    While the Secretary takes issue with many of the factual particulars in the audit, there are broader questions about why those findings are included in the report at all.  Whether or not the expenditures were an appropriate use of HAVA funds is a legal question for the EAC.  Neither internal communications among the Secretary's staff nor external communications with media outlets shed any light on whether the campaign complied with HAVA requirements.

Exhibit 5

The Secretary maintains that the voter education campaign questioned by the auditor complied with the terms of the grant and was a legitimate expenditure of HAVA funds.  The Secretary remains willing to work with the EAC to review the expenditures but requests, based on the discussion above, the documents accompanying this letter, and all prior communications concerning this matter, that the audit be substantially revised to eliminate the inaccurate legal conclusions and factual findings that underpin the result.


Sincerely,

FOR THE ATTORNEY GENERAL


MATTHEW D. GROVE
Assistant Attorney General
Public Officials Unit
State Services Section
720 508-6157
720 508-6104 (FAX)
Email:  matt.grove@state.co.us


AG File:          DOCUMENT3


Exhibit 5

**Appendix A-3**

Exhibit 5



**EAC RESPONSE TO THE DRAFT AUDIT:**
*OIG Performance Audit Report on the Administration of Payments Received Under the Help America Vote Act by the Colorado Secretary of State for the Period April 28, 2003 through September 30, 2012.*

September 30, 2013

MEMORANDUM

To:      Curtis Crider
            Inspector General

From:    Alice P. Miller, Chief Operating Officer &
            Acting Executive Director

Subject:  Draft Performance Audit Report – "Administration of Payments Received Under the Help America Vote Act by the Colorado Secretary of State"

Thank you for this opportunity to review and respond to the draft audit report for the Colorado Secretary of State (SOS).

The Election Assistance Commission (EAC) will work with the SOS to ensure appropriate corrective action.

Exhibit 5

**Appendix B**

Exhibit 5

# AUDIT METHODOLOGY

Our audit methodology included:

- Assessing audit risk and significance within the context of the audit objectives.
- Obtaining an understanding of internal control that is significant to the administration of the HAVA funds and of relevant information systems controls as applicable.
- Identifying sources of evidence and the amount and type of evidence required.
- Determining whether other auditors have conducted, or are conducting, audits of the program that could be relevant to the audit objectives.

To implement our audit methodology, below are some of the audit procedures we performed.

- Interviewed appropriate Office employees about the organization and operations of the HAVA program.
- Reviewed prior single audit reports related to the State's financial management systems and the HAVA program for the period under review.
- Reviewed policies, procedures and regulations for the Office management and accounting systems as they relate to the administration of the HAVA program.
- Analyzed the inventory lists of equipment purchased with HAVA funds
- Tested major purchases and the supporting documentation.
- Tested randomly sampled payments made with HAVA funds.
- Evaluated compliance with the requirements for accumulating financial information reported to the Commission on the financial status reports and progress reports, accounting for property, purchasing HAVA related goods and services.
- Verified the establishment and maintenance of an election fund.
- Verified the State expenditures met the Maintenance of Expenditures requirement.
- Conducted site visits of selected counties to observe physical security/safeguard of equipment purchased with HAVA funds and ensure compliance with federal regulation.

Exhibit 5

**Appendix C**

Exhibit 5

## MONETARY IMPACT AS OF SEPTEMBER 30, 2012

| Description | Questioned Costs | Additional Funds for Program |
|---|---|---|
| Section 102 Unsupported Costs | $5,845 | - |
| Section 101 Unallowable Media Costs | 356,846 | - |
| Total | $ 362,691 | $ - |

Exhibit 5

| | |
|---|---|
| **OIG's Mission** | Help to ensure efficient, effective, and transparent EAC operations and programs |

| | |
|---|---|
| **Obtaining Copies of OIG Reports** | Copies of OIG reports are available on the OIG website, www.eac.gov/inspector_general/

Copies of OIG reports can be requested by e–mail: (eacoig@eac.gov).

Mail orders should be sent to:
  U.S. Election Assistance Commission
  Office of Inspector General
  1335 East West Highway – Suite 4300
  Silver Spring, MD 20910

To order by phone: Voice:  (301) 734–3104
                    Fax:   (301) 734–3115 |

| | |
|---|---|
| **To Report Fraud, Waste and Abuse Involving the U.S. Election Assistance Commission or Help America Vote Act Funds** | By Mail:  U.S. Election Assistance Commission
          Office of Inspector General
          1335 East West Highway – Suite 4300
          Silver Spring, MD 20910

E–mail:   eacoig@eac.gov

OIG Hotline: 866–552–0004 (toll free)

On–Line Complaint Form: www.eac.gov/inspector_general/

FAX:  (301)–734–3115 |



Exhibit 5