

# Executive Action to Advance Democracy:

What the Biden-Harris Administration and the Agencies Can Do to Build a More Inclusive Democracy

Exhibit I

**The assault on our democracy over the last 4 years has been severe, complete with intentional and structural disenfranchisement aimed at Black and brown communities. The Biden-Harris administration has an opportunity to lead in advancing voting rights and strengthening our democracy like few presidencies before. In this piece, Dēmos lays out a series of executive actions the new administration can take in partnership with federal agencies to help ensure the integrity of our elections and strengthen opportunities for civic participation for all Americans, particularly for Black and brown Americans:**

1. Direct federal agencies to provide voter registration services.

2. Strengthen the Department of Justice's enforcement of and guidance on voting rights statutes.

3. Support the Election Assistance Commission in its efforts to strengthen access to voting and voter registration.

4. Create an Office of Democracy and Civic Innovation within the White House.

5. Strengthen the U.S. Postal Service's ability to deliver election mail and other critical mail to all Americans.

6. Ensure access to Federal Bureau of Prison data needed to end prison-based gerrymandering.

The need for strong leadership to advance a more inclusive, representative democracy is urgent, given the increased assaults on voting we have seen in recent years and especially in 2020. Dēmos urges the Biden-Harris administration to take up each of these opportunities immediately after assuming office in January 2021.

1

Exhibit I

## 1. Direct Federal Agencies to Provide Voter Registration Services

There were 76 million eligible but unregistered voters during the 2018 elections.[1] Each election, voter registration poses one of the most significant barriers for Americans trying to vote.[2] The Biden-Harris administration can make voting more accessible by directing specified federal agencies, in their administration of federal programs, to act as voter registration agencies, including providing voter registration applications, assisting clients to complete applications, and transmitting completed applications to state authorities. The administration should:

- Issue an executive order directing federal agencies serving under-registered populations to provide voter registration services, including the Indian Health Service of Health and Human Services,[3] U.S. Citizenship and Immigration Services at naturalization ceremonies,[4] Veterans Affairs offices providing medical and homelessness services, the Social Security Administration through the Supplemental Security Income and Social Security Disability Insurance programs, Department of Defense military pay offices, the Department of Education, and others.

- Take swift action to improve voter registration services through the federally facilitated Health Benefit Exchanges (HBEs), as required by Section 7 of the National Voter Registration Act (NVRA).[5] HBEs must prompt all applicants to accept or decline to register to vote early in the enrollment process, provide a user-friendly link to a voter registration application for online applicants or mail forms for phone or paper applicants, and connect applicants to assistance with completion of applications.[6]

## 2. Strengthen Department of Justice's Enforcement of and Guidance on Voting Rights Statutes

During the campaign, President-elect Biden made a strong commitment to enforcing "laws that protect our voting rights."[7] After 4 years of neglect and outright hostility to voting claims, energetic enforcement is sorely needed. The best way to do that is through a Department of Justice (DOJ) Civil Rights Division that is fully

Exhibit I

staffed by political appointees and career civil servants with deep expertise in and commitment to advancing voting rights for all. As a starting place, the administration should put forth a FY 2022 budget with increased funding for hiring and staffing at the DOJ's Civil Rights Division, including the Voting Rights Section. For its part, the DOJ should:

- Pursue aggressive civil and criminal enforcement of federal voting rights protections, including:

  » Sections 5, 7, and 8 of the NVRA,[8] with Section 5 and 7 enforcement focused on remote transactions (phone, mail, online) and address changes at motor vehicle offices and public assistance agencies, and Section 8 enforcement aimed at preventing unlawful voter purges;

  » Sections 4(e), 203, and 208 of the Voting Rights Act (VRA),[9] to ensure language access;

  » Sections 11(a) and 11(b) of the VRA,[10] which prohibit interference with the right to vote, including refusing to permit a qualified voter to vote and refusing to tabulate, count, or report that vote,[11] and protect against voter intimidation and coercion;[12]

  » Section 2 of the Voting Rights Act to attack vote dilution and vote denial,[13] which will become increasingly important if states attempt to restrict the right to vote in response to the 2020 election and as we enter a new cycle of redistricting; and

  » The provisions of the Civil Rights Act that protect voting rights, including the Act's "materiality provision," which prevents voter registration forms, ballot applications, and ballots from being rejected for minor errors or omissions,[14] and the Act's prohibition on voter intimidation, threats, and coercion.[15]

- File statements of interest and amicus briefs in third-party cases, including those that deal with felony disenfranchisement and denial of voting rights to eligible detainees.[16]

- Update the Department's guidance on the NVRA to address recent developments in the law and resolve ambiguities in the existing guidance, including:

Exhibit I

» More thoroughly explaining the NVRA's prohibition on list-maintenance programs that are non-uniform or discriminatory.[17] For example, programs that use inactivity to initiate a purge process ("use it or lose it" purges), which are not based on direct evidence of ineligibility, may have a disparate adverse impact on voters of color, and would therefore run afoul of the NVRA's requirement that list-maintenance programs be non-discriminatory.

» Clarify that Election Day or pre-election voter eligibility challenges are not exempt from the NVRA. For example, voter challenges based on a claim that the voter does not reside in the district in which the voter is registered must comply with the NVRA's notice procedure. A voter who has not been removed in accordance with that procedure may be required to confirm or affirm the voter's residence but may not be prevented from casting a regular ballot. Additionally, when the challenges are systematic—i.e., when a third-party challenger sends mailings to a large group of voters ("voter caging"), rather than making an individualized challenge of a voter based on specific knowledge of eligibility—they may not be carried out within 90 days of a federal election.[18]

• Rescind the legal interpretation circulated by the Criminal Division of the DOJ's Public Integrity Section on November 4, 2020 that stated 18 U.S.C. § 592 does not prohibit armed federal agents from being deployed to polling locations after the public is no longer casting ballots, but while counting is underway inside the locations.[19]

Additionally, the administration could require that the Office of Personnel Management actively work with language minority communities and Black- and brown-led organizations to recruit a diverse set of individuals for participation in the Federal Voting Rights Observer Program.[20] Having representatives from the communities most targeted by voter suppression serving as observers, and then drafting reports submitted to the Civil Rights Division, could improve reporting and better support the DOJ's efforts to enforce voting rights statutes and affirmatively protect the right to vote.

## 3. Support the Election Assistance Commission in its Efforts to Strengthen Access to Voting and Registration

In administering the NVRA and setting voting standards, the Election Assistance Commission (EAC) can help ensure the accessibility of voter registration and vot-

Exhibit I

ing. The 2020 elections highlighted the importance of expanding voting options—a record 101.5 million Americans voted early, either by mail or in person, in the general election.[21] Meanwhile, several recent elections have demonstrated the danger of overly aggressive voter purges, which tend to have a disproportionate impact on voters of color.[22] In exercising its authority, the EAC should:

- Conduct studies and develop standards and best practices for mail and early voting that make voting more accessible and racially equitable. These standards should include a robust early voting period, available on weekend days and on weekdays outside normal working hours. They should also encourage "no-excuse" voting by mail, expanded use of secure drop boxes for returning ballots, robust and accessible notice and cure procedures for ballots with defects, mechanisms for delivery of mail ballots that allow for private and independent voting for people with disabilities, and permissive rules concerning third-party assistance with obtaining and returning mail ballots.[23]

- Issue guidelines discouraging the use of non-voting to identify potentially ineligible voters and encouraging the use of information from voter interactions with government agencies to confirm continuing eligibility and update voter records. There are many reasons voters do not vote that have nothing to do with their eligibility, and purge programs that rely on non-voting to flag potentially ineligible voters have been shown to be discriminatory and to erroneously target and remove large numbers of eligible voters from the registration rolls.[24] In addition, these programs are expensive for states to administer, often requiring mailings to a significant portion of registered voters who remain eligible. EAC guidance should encourage use of data from state agencies (such as motor vehicle, public assistance, and revenue/taxation agencies) that would allow states to confirm voters' continuing eligibility without the need for expensive mailings. For example, Ohio recently began using driver license renewal data not only to identify voters who had moved but also those whose driver license addresses had not changed, thereby allowing the state to confirm their voting address.

- Continue to protect the federal voter registration form, which the EAC issues under the NVRA, from discriminatory, restrictive, and unnecessary requirements, such as the requirement that voters provide documentary evidence of citizenship to register to vote. Many voters do not possess such documentation, particular low-income voters and voters of color, and these documents can be costly to obtain. The EAC should continue to emphasize that a voter's attestation of citizenship under penalty of perjury is sufficient to establish eligibility.

Exhibit I

When vacancies arise on the EAC, the Biden-Harris administration should appoint commissioners who would bring racial and ethnic diversity to the Commission, and who have a track record of working to advance access to the ballot for all Americans.

## 4. Create an Office of Democracy & Civic Innovation within the White House

Our democracy has never been fully accessible, and the attacks on access to the franchise, especially for Black and brown Americans, have only escalated in recent years. Historic turnout in this election is likely to draw further attacks. We are living through a second civil rights movement, and the Biden-Harris administration can exercise the power of the presidency directly to protect voting rights and expand civic participation. To do so, the administration should:

- Create an office within the White House focused on advancing the administration's efforts to protect and strengthen democratic systems and civic participation. The office would coordinate across the federal government, and with state and local governments, to identify opportunities to increase civic participation among the American people through executive authority, legislation, budgets, strategic communications, and community partnerships.[25]

## 5. Strengthen the U.S. Postal Service's Ability to Deliver Election Mail and Other Critical Mail to All Americans

Upon appointment in May 2020, Postmaster General Louis DeJoy, a Republican fundraiser, swiftly implemented several directives that led to significant delays in mail delivery nationwide. These included strictly limiting overtime for completing mail delivery and dismantling hundreds of high-speed mail sorting machines.[26] Among other harms, these service cuts interfered with Americans' ability to vote by mail, a critical option during the pandemic. While enormous public outcry forced DeJoy to suspend these changes until after the election, threats to the integrity of the U.S. Postal Service (USPS) and our elections remain.[27] To ensure that USPS continues to serve the needs of all Americans and guard against future efforts to undermine mail delivery, especially during an election year, the administration should:

Exhibit I

- Fill the 3 current vacancies on the USPS Board of Governors, and the vacancy that will be created when current member Ron A. Bloom's term expires on December 8, 2020, with special attention to diversity. The Board of Governors may consist of up to 9 members appointed by the president, with the advice and consent of the Senate. These presidentially appointed governors appoint the Postmaster General. Currently, the presidential appointees consist of 6 men, 5 of whom are white.[28]

- Issue an executive order establishing a task force to review the process that led to service cutbacks and equipment removal in the summer and fall of 2020. The task force should issue findings and recommend changes to ensure decisions on mail delivery remain insulated from partisan interference and are implemented solely to serve the mission of USPS.

## 6. Ensure Access to Bureau of Prison Data Needed to End Prison-Based Gerrymandering

Prison-based gerrymandering (PBG) occurs when redistricting authorities count incarcerated persons at their prison locations rather than at their home address for the purposes of drawing legislative districts. The Census Bureau's "usual residence" rule, which locates incarcerated persons at their place of incarceration rather than their actual legal residence, encourages PBG.[29] The practice shifts political power from overpoliced and over-prosecuted communities of color to largely white rural jurisdictions that tend to have prisons.[30] PBG is anti-democratic because incarcerated people are not constituents of the elected officials in the prison location. It is a racist practice that echoes the three-fifths compromise—using Black and brown bodies to boost representation without granting voting rights.

In the long run, the Census Bureau should revise its usual residence rule to count incarcerated persons at their home addresses. Although it is too late for the 2021 redistricting cycle to make this change, the Biden-Harris administration can help mitigate the ills of PBG by taking these actions:

- Direct the Bureau of Prison (BOP) to provide last-known-address data for all persons incarcerated in federal prisons to any state or local jurisdiction that requests this information for the purpose of drawing districts (several state and local jurisdictions have ended PBG);[31] or

Exhibit I

- Order the BOP Director to affirmatively provide this information to all 50 states and encourage them to use it to reallocate incarcerated persons in the 2021 districting process.

    While there are additional reforms that must be adopted by Congress and in the states to ensure that all eligible Americans are able to express their voice through their vote, the above recommendations provide measures that the new administration and the agencies have the power to move immediately. If implemented, these recommendations would prove an important step forward in the effort to create a more inclusive and representative democracy.

Exhibit I

# Endnotes

1.  U.S. Census Bureau, "November Voting & Registration in the Election of November 2018," https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html.

2.  Laura Williamson and Brenda Wright, *Universal Voter Registration: Eliminating One of the Biggest Barriers to Voting,* Dēmos, October 7, 2020. https://www.demos.org/policy-briefs/universal-voter-registration-eliminating-one-biggest-barriers-voting.

3.  Tova Wang, *Ensuring Access to the Ballot for American Indians & Alaska Natives: New Solutions to Strengthen American Democracy,* Dēmos, June 2012. https://www.demos.org/sites/default/files/publications/IHS%20Report-Demos.pdf.

4.  Voter Registration for New Americans: New USCIS Guidance on Voter Registration at Naturalization Ceremonies, Dēmos, December 2011. https://www.demos.org/policy-briefs/voter-registration-new-americans.

5.  52 U.S.C. § 20506.

6.  "Voting Rights Groups Call on Obama Administration to Bring Federal Health Care Exchanges into Compliance with Federal Law," Dēmos, January 23, 2014, https://www.demos.org/press-release/voting-rights-groups-call-obama-administration-bring-federal-health-care-exchanges.

7.  Biden-Harris, "The Biden Plan to Guarantee Government Works for the People," https://joebiden.com/governmentreform/#.

8.  52 U.S.C. §§ 20504, 20506-07.

9.  52 U.S.C. §§ 10303(e), 10503, 10508.

10. 52 U.S.C. § 10307(a)-(b). Section (a) states: "No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." Section (b) states: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section10302(a), 10305, or 10308(e) of this title or section 1973d or 1973g of title 42." Violations of or conspiracies to violate Section 11(a) give rise to criminal as well as civil liability. See 52 U.S.C. § 10308(a), (c).

11. Sam Bagenstos and Justin Levitt, "Refusing to certify legitimate votes is a felony," Detroit Free Press, November 23, 2020, https://www.freep.com/story/opinion/contributors/2020/11/23/michigan-canvassers-who-could-face-felony-charges/6388235002/.

12. The NAACP Legal Defense Fund (LDF) recently brought suit against President Trump and

Exhibit I

the Trump Campaign under Section 11(b) for "intimidat[ing], threaten[ing], or coerce[ing], or attempt[ing] to intimidate, threaten, or coerce" people involved in "aiding any person to vote or attempt to vote." See "LDF Files Lawsuit Against President Trump and the Trump Campaign's Attempts to Overturn the Election by Disenfranchising Black Voters in Michigan," NAACP LDF, November 20, 2020, https://www.naacpldf.org/press-release/ldf-files-lawsuit-against-president-trump-and-the-trump-campaigns-attempts-to-overturn-the-election-by-disenfranchising-black-voters-in-michigan/.

13.  52 U.S.C. § 10301(a).

14.  52 U.S.C. § 10101(a)(2)(B). Subsection (a)(2)(B), sometimes referenced as the "materiality provision," provides that: "No person acting under color of law shall deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

15.  52 U.S.C. § 10101(b) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.").

16.  Recent examples of these types of cases include *Mays v. LaRose,* 951 F.3d 775 (6th Cir. 2020) (concerning the voting rights of eligible detainees), and *Jones v. DeSantis,* No. 20-12003 (11th Cir.) (concerning Florida's felony disenfranchisement scheme and the requirement that individuals pay all legal financial obligations, regardless of ability to pay or to ascertain what they owe, to become eligible to vote).

17.  *See* 52 U.S.C. § 20507(b)(1).

18.  52 U.S.C. § 20507(a), (d); s*ee N.C. State Conference of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 U.S. Dist. LEXIS 153249, at *1 (M.D.N.C. Nov. 4, 2016).

19.  *See, e.g.,* Erick Lichtblau, "Justice Department Okays Use of Armed Agents at Polling Stations During Vote-Counting," *Time,* November 5, 2020, https://time.com/5907600/doj-armed-agents-polls/; *see also* U.S. Department of Justice, Federal Protection of Election Offenses (8th ed.), December 2017, at 9, https://www.justice.gov/criminal/file/1029066/download (describing the requirements of 18 U.S.C. § 592).

20.  Federal Voting Rights Observer Program, Office of Personnel Management, https://www.opm.gov/policy-data-oversight/oversight-activities/voting-rights/.

21.  Michael McDonald, U.S. Elections Project, https://electproject.github.io/Early-Vote-2020G/index.html.

22.  Shruti Banerjee and Stuart Naifeh, "How the Wisconsin Voter Purge Targets Black Voters," Dēmos, December 20, 2019, https://www.demos.org/blog/how-wisconsin-voter-purge-

Exhibit I

targets-black-voters#footnoteref1_mdwi561; see also Michael C. Herron and Daniel A. Smith, "Estimating the Differential Effects of Purging Inactive Registered Voters," (incomplete conference draft, prepared for the 2018 Election Sciences, Reform, and Administration Conference at the University of Wisconsin-Madison), July 22, 2018.

23.  For more on creating more accessible vote-by-mail systems, *see* Laura Williamson, *Universally Accessible and Racially Equitable Vote By Mail,* Dēmos, June 17, 2020. https://www.demos.org/policy-briefs/universally-accessible-and-racially-equitable-vote-mail.

24.  See supra note 22.

25.  This idea has been advanced by Miles Rapoport, former Dēmos President and current Senior Practice Fellow in American Democracy at the Harvard Kennedy School's Ash Center for Democratic Governance and Innovation, among others.

26.  Jacob Bogage, "Postal Service memos detail 'difficult' changes including slower mail delivery," *Washington Post,* July 14, 2020, https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/; *see also* Erik Larson, "DeJoy Tells Judge Mail-Sorting Machines Can't Be Reassembled," Bloomberg News, September 24, 2020, https://www.bloomberg.com/news/articles/2020-09-24/dejoy-tells-judge-mail-sorting-machines-can-t-be-reassembled#:~:text=Postmaster%20General%20Louis%20DeJoy%20told,to%20undermine%20the%20upcoming%20election.

27.  Barbara Sprunt, "Post Office Chief Suspends Controversial Changes Until After Election," NPR, August 18, 2020, https://www.npr.org/2020/08/18/903477948/postmaster-general-will-testify-at-senate-hearing-friday.

28.  "Leadership," The United States Postal Service, https://about.usps.com/who/leadership/board-governors/.

29.  83 Fed. Reg. 5525, 5526-28 (Feb. 8, 2018).

30.  Brenda Wright, *Preventing Prison-Based Gerrymandering in Redistricting: What to Watch For,* Dēmos, May 2, 2011, https://www.demos.org/policy-briefs/preventing-prison-based-gerrymandering-redistricting-what-watch.

31.  "Prison Gerrymandering Project: Solutions," Prison Policy Initiative, https://www.prisonersofthecensus.org/solutions.html.

Exhibit I

# Dēmos

We are a dynamic "think-and-do" tank that powers the movement for a just, inclusive, multiracial democracy.

Through cutting-edge policy research, inspiring litigation and deep relationships with grassroots organizations, Dēmos champions solutions that will create a democracy and economy rooted in racial equity.

Our name means "the people." It is the root word of democracy, and it reminds us that in America, the true source of our greatness is the diversity of our people.

**Media Contact**

media@demos.org

Exhibit I