**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

---

**Representative Dawn Keefer,** et al.

v.

**President Joseph R. Biden, in his official capacity as President of the United States of America,** *et. al.*,

　　*Defendants*.

Civil Action No. 24-cv-00147

MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' PRELIMINARY INJUNCTION
MOTION AND IN SUPPORT OF FEDERAL
DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD.......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.      Plaintiffs cannot prevail on any of their claims against the Federal Defendants.............. 6

        A.      Plaintiffs lack standing to challenge the EO and the related federal agency
                actions. ............................................................................................................. 6

        B.      Even if Plaintiffs had standing, their claims lack merit. ..................................... 11

II.     The balance of the equities counsels against Plaintiffs' requested preliminary
        injunction. ................................................................................................................. 15

CONCLUSION.................................................................................................................. 16

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams Fruit Co. v. Barrett*,
    494 U.S. 638 (1990).............................................................................................. 14

*Benisek v. Lamone*,
    585 U.S. 155 (2018).............................................................................................. 15

*Bond v. United States*,
    564 U.S. 211 (2011)................................................................................................ 9

*Campbell Soup Co. v. ConAgra, Inc.*,
    977 F.2d 86 (3d Cir. 1992)...................................................................................... 5

*Chao v. Rothermel*,
    327 F.3d 223 (3d Cir. 2003).................................................................................. 15

*Chenoweth v. Clinton*,
    181 F.3d 112 (1999)............................................................................................ 8, 9

*Chiafalo v. Washington*,
    140 S. Ct. 2316 (2020).......................................................................................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................................... 6, 10

*Cook v. Gralike*,
    531 U.S. 510 (2001).............................................................................................. 11

*Council of Alt. Pol. Parties v. Hooks*,
    179 F.3d 64 (3d Cir. 1999).................................................................................... 16

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).............................................................................................. 11

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009).................................................................................... 5

*FTC v. Approximately 500 Dozen Flammable Chenille Berets*,
    458 F.2d 1277 (3d Cir. 1972)................................................................................ 16

*Fumo v. City of Philadelphia*,
    972 A.2d 487 (Pa. 2009)....................................................................................... 10

*Goode v. City of Philadelphia*,
  539 F.3d 311 (3d Cir. 2008) ........................................................ 7, 9, 10

*Hindes v. FDIC*,
  137 F.3d 148 (3d Cir. 1998) ................................................................ 14

*Lanin v. Borough of Tenafly*,
  515 F. App'x 114 (3d Cir. 2013) .......................................................... 16

*Logic Tech. Dev. LLC v. U.S. Food & Drug Admin.*,
  84 F.4th 537 (3d Cir. 2023) ................................................................ 14

*Moore v. Harper*,
  600 U.S. 1 (2023) ............................................................................... 12

*Myers v. United States*,
  272 U.S. 52 (1926) ............................................................................. 13

*Raines v. Byrd*,
  521 U.S. 811 (1997) ................................................................... 6, 7, 8, 9

*Russell v. DeJongh*,
  491 F.3d 130 (3d Cir. 2007) .................................................................. 6

*Sierra Club v. Costle*,
  657 F.2d 298 (D.C. Cir. 1981) ............................................................ 13

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ........................................................................... 11

*United States v. Washington*,
  596 U.S. 832 (2022) ........................................................................... 13

*Va. House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ..................................................................... 6, 9

*Vanderklok v. United States*,
  868 F.3d 189 (3d Cir. 2017) .................................................................. 4

*Yaw v. Del. River Basin Comm'n*,
  49 F.4th 302 (3d Cir. 2022) ............................................................. 8, 10

**U.S. CONSTITUTION**

U.S. CONST. art. I, § 4, cl. 1 .................................................................. 11

**STATUTES**

5 U.S.C. § 704 ........................................................................................................ 14

52 U.S.C. § 20901(a) ............................................................................................. 14

**FEDERAL REGISTER**

EO 14019, Promoting Access to Voting,
    86 Fed. Reg. 13623 (Mar. 7, 2021) ................................................................ 3

**OTHER SOURCES**

71 Pa. Stat. § 732-204(c) ...................................................................................... 10

GSA Memorandum,
    https://perma.cc/2HAW-E5TY (Feb. 28, 2022) .............................................. 4

Office of Public and Indian Housing Announcement,
    https://perma.cc/B9EE-W7Z7 (Feb. 9, 2022) .................................................. 4

USDA Policy Memo,
    https://perma.cc/2T79-RHA2 (Mar. 23, 2022) ............................................... 4

*Voter Registration and Health Centers*,
    https://perma.cc/6UJQ-E86L (Mar. 2022) ................................................. 3, 4

## INTRODUCTION

Nearly three years ago, the President issued Executive Order 14019—titled "Promoting Access to Voting" (the "EO")—which called on certain federal agencies to consider how they may help citizens vote under applicable State laws. In response, several of those agencies provided guidance to entities they work with about how those entities could, in the course of their business, educate citizens about applicable voting laws and support voter registration under those laws. Neither the EO nor the related agency actions, however, altered the rules governing who could legally vote or how or when they could legally vote. Nevertheless, the Plaintiffs here—twenty-seven Pennsylvania legislators—brought suit claiming that the EO and the related agency actions somehow violate the Pennsylvania Legislature's constitutional right to set the rules governing how people may vote in federal congressional elections, and how Presidential Electors are to be selected, in Pennsylvania. Plaintiffs then moved for a preliminary injunction, arguing that their baseless legal theory justifies extraordinary relief. The Court should reject Plaintiffs' request for a preliminary injunction, and dismiss Plaintiffs' claims in full.

*First*, Plaintiffs lack standing. The Supreme Court has made clear that individual legislators lack standing to sue to vindicate the institutional interests of a legislative body. The Court has noted that an injury to a legislative body's interests necessarily impacts all of its legislators equally, and thus it is not the type of "personal" and "particularized" injury that could support legislator standing. Here, Plaintiffs, a collection of legislators, are claiming that the EO and related agency actions usurped the election-related powers conferred on the *Pennsylvania Legislature*, which is precisely the type of institutional injury that does not give legislators standing to sue. Plaintiffs try to get around this issue by reframing their injury. They argue that an infringement of a legislature's authority constitutes an infringement of its legislators' rights, and that Plaintiffs are thus seeking

1

to vindicate their own personal rights. Legislators in multiple other cases, however, have advanced similar arguments, and courts have consistently rejected them. And for good reason: an injury to the legislature that impacts the rights of *all* of its legislators is a non-particularized, institutional injury. Plaintiffs also advance several alternative, underdeveloped standing theories—*e.g.*, taxpayer standing, candidate standing, and voter standing—but each theory lacks merit. The Court should therefore  dismiss this suit on jurisdictional grounds alone.

*Second*, even if Plaintiffs had standing, their claims lack merit. Plaintiffs principally argue that the EO and related agency actions conflict with the Elections and Electors Clauses. Those Clauses allow State legislatures to (i) set the rules for who may vote, and when and how they may vote, in federal congressional elections within their States, and (ii) set the rules defining which Electors their States will appoint. But the EO and the related agency actions do not set any rules for how federal congressional elections will be conducted or how Presidential Electors will be chosen. To the contrary, they merely seek to help people vote under the election rules *imposed by State legislatures*. Thus, the EO and the related agency actions do not exercise any power under the Elections and Electors Clauses. Additionally, and similar to their approach on standing, Plaintiffs toss out a number of other underdeveloped legal claims, none of which is viable. Therefore, if the Court reaches the merits,  it should still dismiss Plaintiffs' claims.

*Finally*, Plaintiffs cannot satisfy the remaining requirements for a preliminary injunction. For one, they cannot establish irreparable harm because, as stated above, they have not established an injury that legislators can vindicate in federal court. Further, Plaintiffs are challenging federal government actions that occurred years ago, and their delay in bringing suit undermines any assertion of an irreparable injury meriting prompt relief. Additionally, Plaintiffs' requested injunction would injure the federal government and the public. It would interfere with federal

government operations, and limit efforts to expand access to voter registration and accurate election information. The balance of the equities thus counsels against Plaintiffs' requested preliminary injunction.

Accordingly, the Court should deny Plaintiffs' Motion for a Preliminary Injunction, and grant the Federal Government Defendants' Motion to Dismiss.

BACKGROUND

1. On March 7, 2021, the President issued the EO, which seeks to "promote and defend the right to vote for all Americans who are legally entitled to participate in elections." 86 Fed. Reg. 13623, § 2 (Mar. 7, 2021). In particular, and as relevant here, the EO calls on certain executive agencies to "evaluate ways in which [they] can, *as appropriate and consistent with applicable law*," promote "voter registration and voter participation" in the course of their activities. *Id.* § 3(a) (emphasis added); *see also id.* § 12(b) ("This order shall be implemented consistent with applicable law."). The EO instructs the agencies to consider, for example, "ways to provide" (1) information "about how to register to vote" and "cast a ballot in upcoming elections" and (2) "access to voter registration services and vote-by-mail ballot applications." *Id.* § 3(a)(i) & (iii). Furthermore, the EO specifies that these agency initiatives could include "soliciting and facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises." *Id.* § 3(a)(iii)(C).

In response to the EO, several agencies have issued guidance that seeks to help eligible citizens vote in a manner consistent with State law. For example, a Department of Health and Human Services component issued guidance to "[h]ealth centers"—certain health care providers receiving federal funds—stating that they may, "to the extent permitted by applicable law," support "non-partisan voter registration efforts." *Voter Registration and Health Centers,*

3

https://perma.cc/6UJQ-E86L (Mar. 2022).[1] The guidance noted that those "voter registration activities may include making available voter registration materials to patients," "assisting patients with completing registration forms," and "sending completed forms to the election authorities." *Id.* The guidance, however, notes that the health centers should "consult with their own legal counsel" over "any applicable federal, state, and local legal restrictions." *Id.*

Similarly, in response to "inquiries from" public housing agencies ("PHAs"), the Department of Housing and Urban Development issued guidance reminding PHAs that they may, among other things, make "voter registration forms available to" public housing residents and also provide those residents with "documentation of residence" that may be necessary for voter registration. Office of Public and Indian Housing Announcement, https://perma.cc/B9EE-W7Z7 (Feb. 9, 2022). The guidance also states that it may be "permissible" for PHAs to run "voter registration drive[s]," but only if allowed by "the voter registration laws of [their] state."[2] *Id.* Indeed, the guidance generally cautions that "[m]any rules about voting are set by states, so PHAs should check with their counsel to ensure that all activities are compliant with local and state law." *Id.* The guidance also stresses that "PHAs may not use public housing funds" for "partisan political purposes." *Id.* Other agencies, such as the General Services Administration ("GSA") and the Department of Agriculture ("USDA"), took similar measures.[3]

---

[1] The Court may "take judicial notice" of "information [that] is publicly available on government websites." *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017). Note that internal citations and quotation marks are omitted throughout this brief unless otherwise stated.
[2] Contrary to Plaintiffs' allegation, the guidance did not "instruct[]" PHAs to hold voter registration drives. Am. Compl. ¶ 77.
[3] *See*, *e.g.*, GSA Memorandum, https://perma.cc/2HAW-E5TY (Feb. 28, 2022) (GSA may, "on a case-by-case basis," allow "non-partisan voter registration drive[s]" to be "conducted in a federally owned facility" but "only after consultation with the Office of General Counsel."); USDA Policy Memo, https://perma.cc/2T79-RHA2 (Mar. 23, 2022) (USDA's Food and Nutrition Service issued

2. Plaintiffs filed this lawsuit on January 25, 2024, filed an Amended Complaint on February 16, 2024, and perfected service on February 26, 2024. Plaintiffs named, as Defendants, several State government entities as well as the President and six federal agencies (the "Federal Defendants"). Plaintiffs assert several constitutional and statutory claims against the State government entities concerning certain voter registration policies adopted in Pennsylvania. With regard to the Federal Defendants, Plaintiffs claim that, by trying to help citizens vote consistent with applicable State laws, the EO usurped the Pennsylvania Legislature's constitutional right to set election rules under the Elections and Electors Clauses. *See* Am. Compl. ¶¶ 177-78, 188. Plaintiffs also claim that the actions taken by the federal agency defendants in response to the EO are invalid under the Administrative Procedure Act ("APA"). *See id.* ¶¶ 199, 206. In support, Plaintiffs largely recycle the Elections Clause and Electors Clause claims lodged against the EO. Additionally, on February 16, 2024—years after the EO was issued—Plaintiffs moved for a preliminary injunction. *See* ECF No. 21.

## LEGAL STANDARD

To "support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm," and the Court "should consider the effect" the injunction may have "on other interested persons and the public interest." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90–91 (3d Cir. 1992). Additionally, "to survive a motion to dismiss" a "plaintiff [must] plead more than the possibility of relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "[C]onclusory or 'bare-bones' allegations" are insufficient. *Id.*

letters to state nutritional assistance programs encouraging them to to provide "voter registration and non-partisan, non-campaign election information"). Further, note that although the Department of Energy is a Defendant, Plaintiffs make no substantive allegations concerning any action it has taken due to the EO.

<u>ARGUMENT</u>

**I.      Plaintiffs cannot prevail on any of their claims against the Federal Defendants.**

      A.  <u>Plaintiffs lack standing to challenge the EO and the related federal agency actions.</u>

"To establish Article III standing," a plaintiff must establish "an injury" that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "Legislators," like all other parties, "must satisfy the jurisdictional prerequisites of Article III standing" and "[c]oncerns for separation of powers . . . are particularly acute in legislator standing cases." *Russell v. DeJongh*, 491 F.3d 130, 133 (3d Cir. 2007). The Complaint references several alleged injuries, none of which gives Plaintiffs standing to challenge the federal actions at issue.

1. Plaintiffs principally argue that they are injured because the relevant federal actions allegedly usurp the Pennsylvania Legislature's constitutional authority to regulate federal elections in Pennsylvania. This alleged injury to the Pennsylvania Legislature, however, does not give individual Pennsylvania legislators standing to sue on their own behalf. The Supreme Court recently reaffirmed that "individual members [of a legislature] lack standing to assert the institutional interests of a legislature." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019). An "institutional injury" inflicted on the legislature "necessarily damages all" of its "[m]embers . . . equally," and thus those individual members have not suffered the type of "personal" and "particularized" injury necessary for standing. *Raines v. Byrd*, 521 U.S. 811, 819-21 (1997); *see also id.* at 829 (legislators cannot establish standing based on an alleged "institutional injury" to the legislature that is "wholly abstract and widely dispersed").

Here, Plaintiffs' alleged injury—the purported usurpation of power "*grant[ed] . . . to state legislatures*,"[4] Am. Compl. ¶ 37 (emphasis added)—is obviously an institutional injury that does not give any individual legislator standing to sue. The Supreme Court and the Third Circuit have repeatedly reached the same conclusion. In *Raines*, for example, six Congresspersons challenged the Line Item Veto Act, which gave "the President . . . the authority to 'cancel' certain spending and tax benefit measures after he has signed them into law." 521 U.S. at 814. The plaintiff legislators argued that they had standing because the Act allowed the President, "acting alone," to "'cancel' and thus repeal provisions of federal law," which usurped Congress's "constitutional role in the repeal of legislation." *Id.* at 816. The Court rejected this argument, holding that the plaintiffs alleged only an "institutional injury" that was insufficient to establish legislator standing. *Id.* at 821, 829.

The Third Circuit reached a similar conclusion in *Goode v. City of Philadelphia*, 539 F.3d 311 (3d Cir. 2008). There, the plaintiffs—which included certain City Councilmembers—challenged a settlement agreement that the City had executed in a separate case under which the City largely agreed not to enforce certain City Council billboard ordinances. *Id.* at 313-15. The Councilmembers argued that they had standing to challenge that agreement because it allegedly "usurp[ed] [the] City Council's exclusive power to repeal or amend existing ordinances." *Id.* at 314, 316. The Third Circuit rejected this argument, holding, in line with *Raines*, that the Councilmembers alleged no "particularized injury," but rather lodged only a "generalized complaint[]" about the City's disregard of the Council's authority. *Id.* at 319-20.

_____

[4] At times, Plaintiffs expressly acknowledge that they are seeking to protect rights conferred upon the Pennsylvania legislature as an institution. *See*, *e.g.*, PI Mot. at 4 ("The Electors and Elections Clauses grant certain privileges and rights to 'state legislatures.'"); *id.* at 15 ("The Electors and Elections Clauses grant to the state legislature . . . the power to regulate elections.").

And more recently, in *Yaw v. Delaware River Basin Commission*, multiple parties—including two Pennsylvania State Senators—challenged an interstate commission regulation "banning oil and gas extraction through high-volume hydraulic fracturing within the [Delaware River] Basin," an area that includes parts of Pennsylvania. 49 F.4th 302, 308 (3d Cir. 2022). The plaintiff State Senators argued that they had standing to challenge the "ban on fracking" because, among other things, the ban allegedly "attempted to exercise legislative authority exclusively vested in the General Assembly" and "substantially diminishe[d] the legislative powers of" the plaintiff Senators. *Id.* at 313-14. The Third Circuit, however, found that "[t]hese [were] *classic examples of institutional injuries*" that are insufficient for legislator standing "because they sound in a general loss of legislative power" that impacts "all [General Assembly members]." *Id.* at 314 (emphasis added). Here, as in *Raines*, *Goode*, and *Yaw*, Plaintiffs are simply arguing that the EO exercises power reserved for the collegial body to which they belong—an alleged "institutional injury" that does not give Plaintiffs standing to sue.

Plaintiffs try to evade this precedent by characterizing their alleged institutional injury as a personal harm to their right to vote. In particular, they argue that the EO adopts a policy that can only lawfully be adopted by a State legislature using a process in which legislators (like Plaintiffs) would get to cast votes. *See* Am. Compl. ¶ 162; PI Mot. at 9. But this reformulated injury suffers from the same flaw: it concerns the right to vote of "*all Members* of" the Pennsylvania Legislature "equally," and so it is precisely the type of non-particularized, "institutional injury" that is insufficient for legislator standing. *Raines*, 521 U.S. at 821 (emphasis added). Indeed, this is why the D.C. Circuit rejected a nearly identical injury theory in *Chenoweth v. Clinton*, 181 F.3d 112 (1999). There, four Congresspersons challenged an executive order that "called upon [federal agencies] to provide support for local efforts to preserve certain historically significant"

communities. *Id.* at 113. The congresspersons argued—much like Plaintiffs here—that they had standing because the executive order "deprived [them] of their constitutionally guaranteed responsibility" to "vote on [certain] issues" such as "the expenditure of federal monies." *Id.* The court rejected this argument, concluding that the alleged injury to the Congresspersons' "right[] to . . . vote on legislation" was "widely dispersed" and "abstract," and thus did "not give [the Congresspersons] standing to sue." *Id.* at 115. The same is true here. Furthermore, the plaintiffs in *Raines* and *Goode* also argued that injuries upon the legislature affect the rights of individual legislators, yet the Courts still found that those legislators lacked standing. *See Raines*, 521 U.S. at 816 (rejecting argument that legislators had standing because executive order "divest[ed]" them "of their constitutional role" in the legislative process); *Goode*, 539 F.3d at 316 (rejecting argument that Council Members had standing because the challenged settlement agreement usurped their "right to consider and vote" on legislative matters).

Plaintiffs also argue that the Supreme Court has recognized an equitable cause of action for constitutional claims against government entities, and that the APA creates a cause of action against federal agencies. *See* PI Mot. at 5. But Plaintiffs conflate the question of whether there is a "cause of action" with the question of whether Plaintiffs have "standing" to assert that cause of action. *Bond v. United States*, 564 U.S. 211, 218 (2011). As explained above, Plaintiffs lack standing for the claims they seek to assert. Plaintiffs then argue that a State can sue to defend its legislature's powers, and that a State can authorize any party—including a legislator—to bring that suit on the State's behalf. *See* PI Mot. at 8. But even assuming that the Commonwealth of Pennsylvania could bring suit to vindicate its legislature's powers, Plaintiffs "never indicated . . . that [they are] appearing" in this lawsuit as "agent[s] of the [Commonwealth]." *Bethune-Hill*, 587 U.S. at 1952-53. To the contrary, Plaintiffs brought suit in their own names. Regardless, "[u]nder

9

Pennsylvania law, the Attorney General is the party responsible for representing the Commonwealth in civil suits, not individual legislators." *Yaw*, 49 F.4th at 314 (citing 71 Pa. Stat. § 732-204(c)). Finally, Plaintiffs note that a "Pennsylvania Supreme Court case" allowed "individual state legislators to bring legislative usurpation claims." PI Mot. at 8 (*citing Fumo v. City of Philadelphia*, 972 A.2d 487, 471 (Pa. 2009)). That case, however, "was . . . in a state court" that is "not limited by the exacting federal standing requirements." *Goode*, 539 F.3d at 318. It thus says nothing about whether Plaintiffs have standing to sue in *this* Court. *See Yaw*, 49 F.4th at 316 (rejecting legislators' reliance on *Fumo* to establish standing because it only addressed whether legislators had "standing in state court," not "federal court").

Accordingly, Plaintiffs cannot establish standing based on any alleged usurpation of the Pennsylvania Legislature's powers.

2. Plaintiffs also rattle off a number of other standing theories that the Court can quickly dispose of. Plaintiffs, for example, speculate that the EO will injure them in their capacity as candidates for office (presumably in the upcoming 2024 election cycle). *See* Am. Compl. ¶¶ 172-73. To secure their requested equitable relief, however, Plaintiffs must establish an injury that is "certainly impending." *Clapper*, 568 U.S. at 401. The Complaint contains no allegations describing how Plaintiffs' candidacies will "certainly" be harmed by the EO. It contains no concrete allegations establishing that the EO will have a material impact on the votes cast in Plaintiffs' particular districts, and that this impact will harm Plaintiffs' electoral prospects.

Plaintiffs also allege that the EO will burden them in their capacity as voters. *See* Am. Compl. ¶ 191. But Plaintiffs do not explain how the EO will affect their ability to vote in any way. Plaintiffs appear to allege only that the EO may ultimately increase voter participation, but it is unclear how that would inhibit Plaintiffs from casting their votes and having their votes counted.

Finally, Plaintiffs allege that they have standing to challenge the EO in their capacity as taxpayers with an interest in the government's use of tax dollars. *See id.* ¶ 192. The Supreme Court, however, has made clear that there is a "general prohibition on taxpayer standing" with a "narrow exception" for "only . . . Establishment Clause" claims. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 347 (2006). This case, of course, does not involve an Establishment Clause claim.

Accordingly, Plaintiffs' remaining standing theories fail, and the Court thus lacks jurisdiction over Plaintiffs' claims against the Federal Defendants.

B. <u>Even if Plaintiffs had standing, their claims lack merit.</u>

i. *Plaintiffs' claims against the EO fail.*

1. Plaintiffs first claim that the EO violates the Elections Clause, under which State legislatures may prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. CONST. art. I, § 4, cl. 1. The Elections Clause has been construed to allow State legislatures "to prescribe the *procedural mechanisms* for holding congressional elections." *Cook v. Gralike*, 531 U.S. 510, 523 (2001) (emphasis added); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). Those procedural rules may concern, for example, where citizens may vote, how voting booths will be "supervis[ed]," and the process for "counting" votes and "publi[shing] [the] election returns." *Cook*, 531 U.S. at 523–24.

Here, the EO sets no procedural rule governing any federal congressional election. It does not, for example, determine who is allowed to vote or where they may vote. To the contrary, it merely tries to provide accurate information about, and expand access to voter registration in a manner consistent with, *the States'* procedural rules. *See supra* at 3. Indeed, as Plaintiffs acknowledge, many private entities engage in similar efforts. *See* Am. Compl. ¶ 91.

Furthermore, Plaintiffs' theory, if accepted, would have troubling consequences. Plaintiffs appear to argue that any government action that may affect federal congressional elections violates the Elections Clause. Many government actions, however, could affect federal congressional elections; *e.g.*, time-off awards that allow government employees to go vote on election day, transit subsidies that may be used to travel to a polling station, and speeches by government actors on pressing political issues may all affect congressional elections. Under Plaintiffs' extraordinary theory, all of those routine government activities could be unconstitutional. The Court should reject Plaintiffs' theory and dismiss their Elections Clause claim.

Plaintiffs' Electors Clause claim fails for similar reasons. The Electors Clause grants State legislatures the right to "define the method" of selecting Electors. *Moore v. Harper*, 600 U.S. 1, 27 (2023); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (the Electors "clause . . . convey[s]" the "power of determination over who becomes an elector"). States have generally exercised their Electors Clause power by "appoint[ing] a slate of electors selected by the political party whose candidate has won the State's popular vote." *Chiafalo*, 140 S. Ct. at 2319.

Here, the EO does not define how Electors will be chosen in any State. Again, it merely tries to facilitate voter participation in a manner consistent with applicable State laws. Plaintiffs cite to no precedent indicating that such activity in Presidential elections could in any way violate the Electors Clause. Indeed, virtually every Presidential campaign encourages citizens to vote for a particular candidate—which in turn could impact which Electors are chosen under State law— but Plaintiffs do not suggest that those campaigns violate the Electors Clause. Further, Plaintiffs' Electors Clause theory raises the same practical issues as their Elections Clause theory. Many routine government actions may impact voter turnout, and those actions could be rendered

unconstitutional if Plaintiffs' legal theory were accepted. *See supra* at 12. The Court should dismiss the Electors Clause claim.

2. Plaintiffs also claim, in passing, that the EO was issued without Congressional authorization. *See* PI Mot. at 12; Am. Compl. ¶ 69. But Congressional authorization for the EO was unnecessary. The EO issues directives to Executive Branch agencies and officials, which is a proper exercise of the President's Article II authority. *See Myers v. United States*, 272 U.S. 52, 135 (1926) (The "duties of [executive] officers" come "under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise" those officers' activities); *Sierra Club v. Costle*, 657 F.2d 298, 405–06 (D.C. Cir. 1981) ("The authority of the President to control and supervise executive policymaking is derived from the Constitution."). The Court should reject any argument that the EO was not authorized by Congress.

3. Plaintiffs finally argue that the EO violates a Pennsylvania law which provides that certain election-related "cost[s] and expense[s] to State and local governments . . . shall be funded only upon lawful appropriation" rather than by "any nongovernmental entity." Am. Compl. ¶ 62; *see also* PI Mot. at 12. It is unclear how this law—which regulates the funds that *Pennsylvania State and local governments* can accept and use—applies to this EO. Regardless, and more fundamentally, States have no general power to regulate the federal government. *See United States v. Washington*, 596 U.S. 832, 835 (2022) (The "Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate" it). Plaintiffs, in response, posit that State laws regulating federal elections should preempt any conflicting federal laws. *See* PI Mot. at 13. Unsurprisingly, Plaintiffs cite to no precedent for this assertion, nor could they: it contravenes

the "truism that States may not pre-empt federal law." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990). The Court should dismiss Plaintiffs' claim that the EO violates Pennsylvania law.

       ii.    *Plaintiffs' APA claims against the federal agency defendants also fail.*

Plaintiffs claim that the actions taken by the federal agency defendants in response to the EO are substantively and procedurally unlawful under the APA. As a threshold matter, these claims fail because the agency actions at issue are not reviewable under the APA. The APA only allows for judicial review of "final agency action[s]." 5 U.S.C. § 704. "Agency action" is "'final' only if . . . it is one by which rights or obligations have been determined or from which legal consequences will flow." *Logic Tech. Dev. LLC v. United States Food & Drug Admin.*, 84 F.4th 537, 551 (3d Cir. 2023). The legal consequences of an agency action may render it final only if those consequences are "direct[]" and "concrete." *Hindes v. FDIC*, 137 F.3d 148, 162 (3d Cir. 1998). Here, the agency actions at issue do not "determine[]" any party's "rights or obligations," nor do they have any "direct" and "concrete" legal consequences. Indeed, those actions have no independent legal effect at all. They merely inform parties about how they can lawfully facilitate voter participation. *See supra* at 3-5. Accordingly, the relevant federal agency actions are not reviewable under the APA.

In any event, Plaintiffs' APA claims fail for other reasons. First, their substantive challenges are meritless. In arguing that the relevant agency actions are unlawful, Plaintiffs largely rely on their Elections Clause and Electors Clause theories. *See* Am. Compl. ¶¶ 108, 196. Those legal theories fail here for the reasons explained above. *See supra* at 11-13. Plaintiffs also argue that the relevant agency actions violate the Help America Vote Act ("HAVA"), which authorizes "payment[s] to each State" to help with election administration. 52 U.S.C. § 20901(a). Plaintiffs rely on a U.S. Election Assistance Commission advisory opinion stating that HAVA funds cannot

14

"be used" for "voter registration drives or get out the vote efforts." Am. Compl. ¶ 95. But Plaintiffs make no concrete allegation indicating that any agency action at issue even addressed the use of HAVA funds, much less directed States to use those funds for impermissible purposes.[5]

Plaintiffs' procedural APA claim fails as well. Plaintiffs argue that the federal agency defendants had to use notice-and-comment rulemaking before taking the actions at issue. *See id.* ¶ 207. Federal agencies must use notice-and-comment when issuing "[l]egislative rules;" *i.e.*, rules that "impose new duties upon the regulated party [and] have the force and effect of law." *Chao v. Rothermel*, 327 F.3d 223, 227 (3d Cir. 2003). By contrast, "procedural rules and statements of policy" that "do not" alter the legal "rights or interests of the parties . . . are exempted from the notice and comment requirement." *Id.* Here, again, the relevant agency actions do not alter any party's legal rights or interests, and so notice-and-comment were not required. *See supra* at 3-5. Accordingly, the Court should dismiss Plaintiffs' APA claims.

## II.     The balance of the equities counsels against Plaintiffs' requested preliminary injunction.

Even aside from the merits, Plaintiffs cannot satisfy the remaining requirements for emergency relief. First, as explained above, Plaintiffs have not established an injury that they may vindicate in federal court. *See supra* at 6-10. Regardless, their delay in bringing suit undermines their assertion that they are suffering an irreparable injury warranting a preliminary injunction. "A party requesting a preliminary injunction must generally show reasonable diligence," including "in election law cases." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Here, the EO was issued

---

[5] Plaintiffs also briefly allege that the General Services Administration ("GSA") violated the National Voter Registration Act ("NVRA") because GSA may allow certain parties to use certain federal buildings for voter registration drives even though GSA is not a "voter registration agency" under the NVRA. *See* Am. Compl. ¶¶ 84, 196. But Plaintiffs never explain how the NVRA requires GSA to be a "voter registration agency" before it can facilitate voter registration drives.

almost three years ago, in March 2021, and several of the related agency actions were likewise taken years ago, *see supra* at 3-5, yet Plaintiffs waited until January of 2024 to bring suit. In light of this delay, Plaintiffs cannot establish the requisite irreparable harm. *See Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117–18 (3d Cir. 2013) (a "[d]elay in" bringing suit "indicate[s] at least a reduced need for . . . speedy" relief).

Conversely, an injunction against the EO and related agency actions would harm both the federal government and the public. It would not only interfere with federal government operations, but could also limit efforts to help eligible citizens vote, all of which counsel against Plaintiffs' requested relief. *See FTC v. Approximately 500 Dozen Flammable Chenille Berets*, 458 F.2d 1277, 1280 (3d Cir. 1972) (the "judiciary must exercise restraint not to interfere in the . . . executive functions of government"); *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 80 (3d Cir. 1999) ("voter education" is an "important and legitimate interest[]").

<u>CONCLUSION</u>

The Court should deny Plaintiffs' Motion for a Preliminary Injunction and grant the Federal Defendants' Motion to Dismiss.

Dated:  March 1, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         LESLEY FARBY
                                         Assistant Director, Federal Programs Branch

                                         */s/ Kuntal Cholera*
                                         KUNTAL CHOLERA (D.C. Bar No. 1031523)
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington D.C. 20005
                                         Kuntal.Cholera@usdoj.gov
                                         Telephone: (202) 305-8645

## **Word Count Certification**

The body of this brief is 4,977 words long.

/s/ Kuntal Cholera